**UNITED STATES of America,**
**Appellee,**

v.

**Edward BAKER, Ralph Masciola and**
**Dominick DiNorscio, Appellants.**

**Nos. 54–55, 59, Dockets 33427–33428, 33432.**

United States Court of Appeals
Second Circuit.

Argued Sept. 17, 1969.

Decided Oct. 15, 1969.

Certiorari Denied March 9, 1970.
See 90 S.Ct. 1086, 1096.

Jay Gold, Asst. U. S. Atty., New York City (John H. Doyle, III, Paul B. Galvani, Asst. U. S. Attys., and Robert M. Morgenthau, U. S. Atty., on the brief), for appellee.

Robert Kasanof, New York City, for appellant Edward Baker.

Michael A. Querques, Orange, N. J. (Harvey Weissbard and Querques, Isles & Weissbard, Orange, N. J. on the brief), for appellants Ralph Masciola and Dominick DiNorscio.

Before LUMBARD, Chief Judge, and WATERMAN and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Edward Baker, Ralph Masciola, and Dominick DiNorscio appeal from their

convictions for various offenses, all of which flow from a single truck hijacking committed on October 13, 1966.

The three appellants were among twelve defendants charged under a five-count indictment, filed March 1, 1967.[1] Count I of the indictment charged a conspiracy to steal motor-trucks containing interstate shipments, to transport the trucks and their contents in interstate commerce, and then to conceal and sell the stolen trucks and their contents in violation of 18 U.S.C. §§ 659, 2312, 2314, 2315; Count III, theft of a tractor-trailer containing an interstate shipment of women's garments in violation of 18 U.S.C. § 659; Count IV, kidnaping the driver of the stolen truck in violation of 18 U.S.C. § 1201; Count V, transporting the stolen truck and its contents in interstate commerce, in violation of 18 U.S.C. § 2314. Count II concerned another theft in which none of the three appellants were involved.[2]

Baker was convicted of conspiracy and each of the substantive crimes. He was sentenced to concurrent terms of five years under the first and fifth counts and ten years under the third and fourth counts. Masciola, convicted of conspiracy, theft, and transporting stolen goods, received concurrent sentences of five years on Count I and seven years on Counts III and V. DiNorscio was convicted only of conspiracy, for which he received a sentence of five years imprisonment.

The government's principal witness was Roland Warren, one of the twelve defendants named in the indictment.

Warren testified that a conversation with Joseph Roselli, another of the indicted defendants, led to his initial involvement in the hijacking. On the 10th or 11th of October in Kazam's Bar in Newark, Roselli told Warren that he knew some people who wanted a truckload of clothing and asked Warren to steal another "load" from Gilbert Carrier Corporation. Warren, who had not received full payment for a previous hijacking in which he had participated,[3] was reluctant, despite Roselli's assurances that the people he knew were "pretty reliable." A day or two later on October 12, Roselli encountered Warren in the same bar and offered to introduce him to the people who wanted to obtain a load of hijacked clothing. Warren became interested and accompanied Roselli to the house of appellant Ralph Masciola in Newark, where he met Masciola, co-defendant Vito Panepinto, and one Danny, introduced as Masciola's "cousin." After Masciola asked Warren to "take another shot at Gilbert" and assured him that he would be paid this time, Warren agreed to the proposal.

On October 13 Roselli again met with Warren in Kazam's Bar and informed him that the hijacking could proceed at once. Accordingly, later in the day Warren recruited the two men who were to participate in the hijacking with him, appellant Edward Baker and co-defendant Ramon Comer. Early that evening Warren, Baker and Comer planned the details of the hijacking at a meeting with Roselli in a Jersey City diner. It was agreed that the truck would be stolen later that evening.

---

1. The charges against the other nine defendants named in the original indictment received various dispositions. Arthur Acunto, Carmine Paonessa and Mario Stefano were tried separately and convicted; on September 17, 1969 we affirmed their convictions in open court. Ramon Comer, Robert Hicks, Thomas Ludlow, and Vito Panepinto entered guilty pleas to various counts of the indictment. Joseph Roselli died prior to trial. The indictment was severed and

is still pending against Roland Warren, the main government witness in this case.

2. Because Count II of the indictment did not apply to this case, the district court renumbered Counts III, IV, and V as II, III, and IV respectively for submission to the jury. In this opinion we have referred to the original numbering.

3. Acunto, Paonessa, and Stefano, three of the defendants charged under the indictment, were tried and convicted for crimes arising out of this previous hijacking.

The hijacking proceeded according to plan. At about 11 p. m. on October 13, Arnoldo Medina, driver of a Gilbert tractor-trailer containing more than twelve thousand women's garments consigned to outlets in California, was forced to halt his truck at Washington and Perry Streets in Manhattan. As soon as the vehicle was stopped, Baker entered the cab of the truck, put a gun to Medina's neck, and ordered him to move out of the driver's seat. Warren then took the wheel of the truck and drove it through the Holland Tunnel to Jersey City. Comer followed in Warren's car. Upon reaching Jersey City, Warren and Baker locked Medina in another truck, then telephoned Masciola's house. After a brief conversation, they proceeded to the Club 36 in Newark, parking the truck nearby. A short time later they were joined by Roselli, Masciola and Panepinto; the entire group then moved to another bar where they awaited the arrival of the contraband purchaser. Eventually, an unidentified man arrived at the bar and gave Roselli $2,000, which he in turn paid over to Warren. Following the instructions of this unidentified individual, Warren drove the stolen truck to a "drop" in Passaic. Another unknown man, who joined Warren in Passaic, assured him that he would receive an additional $4,-000 shortly.

When he failed to receive the promised additional payment, Warren telephoned Roselli the night following the hijacking. Pursuant to this conversation, Roselli and Warren drove to Passaic the following morning "to see about getting [their] money." Roselli parked the car and walked off. After a two-hour wait Warren became restless and went searching for Roselli. He found Roselli waiting for someone in a telephone booth. The man in the booth was appellant Dominick DiNorscio, whom Roselli introduced to Warren as Tommy Adams. DiNorscio told Warren that the load he had stolen was comprised largely of maternity clothes and therefore not as valuable as might have been expected. He also told Warren that it was difficult to dispose of this merchandise "at this time of the year," but that he would undertake personally to dispose of it if there were further delays. He then gave Warren $100, apparently in part payment for his role in the hijacking.

I.

The three appellants present a full panoply of challenges to the validity of their convictions. For purposes of analysis, we shall divide the issues presented for review into three categories: first, objections raised by all three appellants to the admission and exclusion of evidence; second, the various challenges addressed to the validity of Masciola's and DiNorscio's conspiracy convictions; and, third, issues which pertain only to Baker.

*Admission of Evidence*

(a)

During a search incident to the arrest of Baker, FBI agents discovered and seized two guns, one of which was identified at trial as the gun employed by Baker in the hijacking.[4] All three appellants regard the introduction of both guns at trial as error. If appellants' assumption that the guns proved no more than general bad character were true, we would be compelled to accept their conclusion. See United States v. Johnson, 382 F.2d 280, 281 (2d Cir.

---

4. Baker originally contested the legality of the search which led to the seizure of the two guns on the ground that its scope was unreasonable in the light of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). After our decision in United States v. Bennett, 415 F.2d 1113 (September 9, 1969), holding *Chimel* applicable only to searches conducted after June 23, 1969, Baker ceased to press this contention in apparent recognition that the search would be considered reasonably incident to his arrest under pre-*Chimel* law. See, e. g., Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947).

1967). But the two guns showed far more than general bad character or propensity to crime. Baker's possession of the guns proved that he was equipped to commit the very crime of which he was charged. For this reason the guns were relevant, and the court's decision to admit them, proper.[5] Payne v. United States, 111 U.S.App.D.C. 94, 294 F.2d 723, 725 (1961); Morton v. United States, 87 U.S.App.D.C. 135, 183 F.2d 844 (1950).

### (b)

During Warren's cross-examination, he refused to disclose the name and address of his current employer, a refusal upheld by the district court. Appellants contend that this decision of the trial court constituted reversible error; they base their contentions on two Supreme Court cases in which the Court required prosecution witnesses to reveal their residences. See Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); Garafolo v. United States, 390 U.S. 144, 88 S.Ct. 841, 19 L.Ed.2d 970 (1968), rev'g 385 F.2d 200 (7th Cir.1967). But Smith and Garafolo are easily distinguishable, for in neither of these cases did the government witness furnish any specific justification for refusing to reveal his residence. Here, however, in response to inquiries by the judge in the absence of the jury, Warren testifed that he had received threats to his life; on one occasion Warren had heard Masciola describe how he had killed a prospective prosecution witness in another case in a New Orleans hospital. After hearing this testimony, the district judge was "satisfied that this witness is honestly and reasonably apprehensive of danger to himself and to his family." In contrast to this finding that Warren's safety would be endangered if his place of employment were to be revealed, the defendants' showing of

need to know the name and address of Warren's employer was inconsequential. Since the defense had become fully acquainted with Warren's background from materials provided pursuant to 18 U.S.C. § 3500, they were able to cross-examine him extensively and effectively. Moreover, the only explanation defense counsel offered for requesting the witness to disclose his place of employment was that he wished "to know whether he [Warren] is working and really making this money he says he is making." In the light of these circumstances, we believe the trial judge exercised his discretion properly. United States v. Bennett, 409 F.2d 888, 901 (2d Cir.1969).

### (c)

The final evidentiary issue raised by the appellants relates to the district court's refusal to admit the entire record of Warren's confinement at the Greystone State Hospital, a mental institution, under the Federal Business Records Act, 28 U.S.C. § 1732. The argument fails however, for several reasons. First, there was no showing that the records qualified for admission under the statute. Second, since both the government and defense counsel explored the subject of Warren's confinement fully on both direct and cross-examination, the record of confinement would have provided nothing more than cumulative evidence. Finally, because Warren's brief confinement occurred more than ten years prior to trial, the judge properly exercised his discretion in excluding the records as relating to events "too remote from the date of this trial to be of any probative value." It is of interest that after this ruling the defense counsel made no further endeavor either to show that the documents conformed to the requirements for admissibility under the statute or to bridge the gap between the information contained in the ten-

---

5. Cases cited by appellants holding that guns seized from individuals other than a defendant are inadmissible, see, e. g., Macklin v. United States, 133 U.S.App. D.C. 347, 410 F.2d 1046 (1969), or that

weapons cannot be admitted to prove an accusation in which weapons played no part, see, e. g., United States v. Reid, 410 F.2d 1223 (7th Cir. 1969), are inapposite.

year old record and Warren's present mental condition.

## II. *Conspiracy Convictions of Masciola and DiNorscio*

■ Contrary to the arguments of DiNorscio, the record contains ample support for his conspiracy conviction. DiNorscio's meeting with Warren and Roselli two days after the hijacking, his acquaintance with the contents and quality of the "load," his knowledge that Warren had obtained the clothing, his payment of $100 to Warren, and his promise to dispose of the goods himself (if necessary), fully support the jury's conclusion that he participated in the conspiracy.

■ Nor can we accept the contention of Masciola and DiNorscio that the evidence showed not the single, all-encompassing scheme charged in the indictment, but multiple conspiracies—one to hijack the truck and another to dispose of the stolen merchandise. The involvement of all of the appellants with Roselli provides a common thread running throughout the entire episode. DiNorscio's denial of any connection with the theft itself is negated by his payment to the hijacker Warren. Roselli's remarks to Warren prior to the hijacking concerning the people who wanted the "load" suggest that those conspirators whose primary responsibility was the receipt and disposition of the stolen goods nevertheless had knowledge of the hijacking plans.

■ In any event, even if the proof did suggest the existence of multiple conspiracies rather than a single, unified scheme, appellants have not shown the variance to be fatal; nor have they established that any substantial prejudice resulted from their being charged for one instead of two conspiracies. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). This is not a case in which the government has circumscribed in a single trial a large number of participants in a great number of loosely connected incidents. See,

e.g., Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Here we have a comparatively short trial of but three defendants, all of them involved in a single series of events confined to a period of less than one week.

■ Appellants' challenge to the court's instructions on the law of conspiracy is equally unavailing. With specific reference to guilt under the conspiracy count, the district judge charged that a defendant "is responsible for what every one of the conspirators does or says in furtherance of the scheme, even if done or said prior to his joining." At the request of DiNorscio's counsel, the district court supplemented this instruction by charging that a defendant cannot be convicted as a principal for "substantive offenses which were committed in furtherance of the conspiracy before he joined it or after he withdrew from it." No objections were taken to this supplemental charge. Viewed as a whole, the charge correctly stated the law of conspiracy. See Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

■ Neither was the court's failure to include in its charge a specific statement that each defendant's participation in the conspiracy must be shown solely by his own acts and deeds error. We have held that in a conspiracy case the court must make a preliminary determination whether, if the testimony of the government witnesses is accepted as true, each defendant's own acts and statements show a connection with the conspiracy sufficient to justify the admission of the acts and statements of co-conspirators against him. United States v. Stromberg, 268 F.2d 256 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959); United States v. Ragland, 375 F.2d 471 (2d Cir.1967), cert. denied, 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968). Once the judge has made such a determination, as he did in this case by denying a motion for acquittal on the conspiracy

count, the jury may consider the acts and declarations of co-conspirators made in furtherance of the common scheme in determining whether the elements of the crime of conspiracy, including purposeful entry into the conspiracy, are present.

Therefore, that portion of the court's instructions which charged, "in determining whether or not the defendant knowingly joined a conspiracy, you should examine and consider all the evidence in the case," was entirely proper. United States v. Nuccio, 373 F.2d 168, 173 (2d Cir.), cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1965).

### III. *Issues Raised by Baker*

#### A. Kidnaping

 Baker challenges the validity of his kidnaping conviction on two grounds. The first is a somewhat bizarre claim of double jeopardy arising from the following circumstances. At the close of the government's case, the trial court granted a motion for a judgment of acquittal as to the kidnaping count of the indictment. Upon reconsideration, the court shortly thereafter reinstated the Baker kidnaping count. Both the initial decision and its recall occurred out of the hearing of the jury. We must confess that we have difficulty in perceiving any connection between a defendant's constitutional right not to be placed twice in jeopardy and the events we have recited. Even those cases which define the scope of double jeopardy most broadly offer no support for Baker's argument. See, e.g., Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963); Fong Foo v. United States, 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962). In the case before us, no final judgment of acquittal was ever entered, and certainly Baker was not subjected to the harassment of successive prosecutions. Nor did the prosecution seek a delay in order to obtain a more favorable opportunity to convict. The only prejudice Baker suffered is

psychological; his hopes were first raised, then quickly lowered. But so ephemeral and insubstantial an injury is not proscribed by the Constitution.

 Baker also contends that, since his crime was essentially robbery, the kidnaping count merged with the other offenses and therefore cannot support a separate conviction. This argument has no support in any federal court decision or in the language of the Federal Kidnaping Act, 18 U.S.C. § 1201, which required only that the victim be transported in interstate commerce and "held for ransom or reward or otherwise." That the ultimate purpose sought to be furthered by a kidnaping is theft in no way precludes conviction under the Act. United States v. Healy, 376 U.S. 75, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964).

#### B. Identification Procedures

 At trial, Medina, the driver of the stolen truck, identified Baker as one of the men who had taken part in the hijacking. Baker bases the first of his two challenges to this identification on the ground that previous photographic identifications had distorted Medina's judgment. The government does not dispute that prior to trial, Medina had twice viewed photographs of Baker. The first identification took place in January, 1967, four months after the hijacking and before Baker's arrest. On that occasion, FBI agents showed Medina, one at a time, a series of fifteen pictures which included one photograph of Baker. In January, 1969, ten days before trial, Assistant United States Attorneys conducted a second identification session, at which Medina was shown a group of eleven photographs, including two of Baker. On both occasions Medina tentatively identified Baker as the gunman in the hijacking, though he cautioned both the government agents and attorneys that he found it difficult to distinguish one Negro from another and could not make a definite identification until he saw Baker in person.

We do not believe that these photographic identifications were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L.Ed.2d 1247 (1968); see United States v. Bennett, 409 F.2d 888, 898 (2d Cir.1969) (series of only six photographs found not to give rise to likely misidentification). As a result of the searching cross-examination of Medina conducted by defense counsel, the jury was fully aware of the existence and nature of the previous photographic identifications and was able to give them due consideration in judging Medina's credibility. That two pictures of Baker were shown to Medina at the second photographic identification does not, in itself, constitute impermissible suggestion. United States v. Butler, 405 F.2d 395 (4th Cir.1968). It is of some interest that in *Simmons* the group of photographs examined by the witnesses contained six pictures of one defendant. Furthermore, Medina's identification testimony had a sound basis in personal observation; he had observed Baker at close range throughout the drive from Manhattan to Jersey City. Finally, Medina's inability to make a definite identification of Baker as a result of viewing the photographs suggests both that the techniques employed by the government were not overly suggestive and that no likelihood of irreparable misidentification had been created.

Baker urges in the alternative that even if Medina's judgment had not been clouded by his previous exposure to photographs of Baker, the circumstances surrounding his identification of Baker in open court were so unfair as to constitute grounds for reversal. Specifically, with the exception of two jurors, Baker was the only Negro in the courtroom when Medina, who admittedly had difficulty in distinguishing one Negro from another made his identification. Viewing this confrontation in the setting in which it arose, we find no violation of due process. Since Baker's counsel was present in the courtroom when Medina identified his client, he was able to expose the weak points in the identification procedures on cross-examination by eliciting the statement from Medina that he "had trouble identifying Negroes," and emphasizing that no other Negroes were present in the courtroom. Cf. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S. Ct. 1951, 18 L.Ed.2d 1178 (1967).

Moreover, that Baker was the only Negro present was not primarily the fault of the court or the prosecution, but rather the result of a decision by Baker's experienced and able counsel. On the day before the trial commenced the Assistant United States Attorney who was to prosecute the case informed Baker's counsel that a line-up scheduled for that day had been cancelled but that Medina would be asked to identify Baker in open court. When the district judge learned of this conversation before the jury entered the courtroom on the first morning of the trial, he asked counsel whether he had "done anything about bringing in any other persons into the courtroom." Counsel conceded that he had not done so. The only explanation he offered for his failure to act was to state that "line-ups are a traditional police function" and that he knew of no "facility [he] could have under the Criminal Justice Act to dragoon people into this courtroom." He had apparently not considered the applicability of 18 U.S.C. § 3006A(e), the section of the Criminal Justice Act which authorizes counsel to obtain "investigative, expert or other services necessary to an adequate defense."

Shortly thereafter, the court assured counsel that he could still obtain the type of identification procedure he desired. "It seems to me," the judge stated, "that you are entitled to exercise a little ingenuity on your own behalf." "The only

thing that I can see that might be done here," he continued, "is we will have the defendants sit among the audience at any place they choose to sit for the purposes of the trial." Counsel spurned these helpful suggestions. Although Medina was not to give his identification testimony until the afternoon session, during the luncheon recess counsel made no attempt to enlist the aid of the court, the marshals, or anyone else in assembling other Negroes to be seated in whichever parts of the courtroom he designated; nor, did he ever request an adjournment for a period sufficient to permit assembling individuals for the type of line-up he considered appropriate. In sum, counsel showed very little willingness to assist in creating the type of atmosphere he professed to consider necessary to a fair identification. It may be that his primary aim was to make a record for appeal; in any case, counsel made no genuine effort to achieve what he now claims was his objective.

Several additional factors fortify our conclusion that counsel's failure to respond to the court's invitation does not require reversal. First, since Medina had viewed Baker over a considerable period of time during the hijacking, his identification was grounded on extended personal observation. Second, any assumption on the part of defense counsel that Medina would have identifed any Negro sitting alone in the courtroom as the gunman is belied by the witness' frank confession of inability to identify a gun shown him by the prosecutor as the weapon Baker used in the hijacking. Finally, since Warren also identified Baker as a participant in the hijacking. Medina's identification testimony was only cumulative.

We have carefully considered the other points raised by the three appellants and conclude that they are without merit.

Affirmed.