UNITED STATES of America, Plaintiff,

v.

Jerome WASHINGTON, Defendant.

No. 2:92–CR–63–05.

United States District Court,
D. Vermont.

Sept. 20, 1993.

See also, 819 F.Supp. 358.

John P. Tavana, Gregory L. Waples, Asst. U.S. Attys., Burlington, VT, for plaintiff.

William K. Sessions, III, Sessions, Keiner, Dumont, Barnes & Everitt, Middlebury, VT, for defendant.

## OPINION AND ORDER

PARKER, Chief Judge.

On July 19, 1993, after sixteen days of trial and two and one-half days of deliberations, a jury found defendant Jerome Washington and two co-defendants guilty of conspiracy to distribute cocaine. In addition, Jerome Washington was convicted on three separate counts: two counts of actual distribution of cocaine, and one count of possessing a gun with an obliterated serial number. He was acquitted on one count of actual distribution. Jerome Washington now moves for judgment of acquittal on the counts of conviction pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, or in the alternative, for a new trial. For the reasons stated below, defendant's motion for judgment of acquittal on the gun count is granted. His motion for judgment of acquittal on the conspiracy and drug distribution counts is denied. His motion for a new trial is also denied.

### Discussion

Jerome Washington claims that the Court erred in several of its rulings during the trial in this case and that these errors resulted in an unfair trial which violated his Fifth and Sixth Amendment rights. Specifically, Jerome Washington asserts that the Court erred in the following ways: (1) by denying his motion to change venue which was made during the jury selection process; (2) by permitting jurors who had knowledge of a related shooting and/or the defendant's related state trial to serve on the jury; (3) by subjecting the defendant to double jeopardy on two counts of actual distribution by first granting a motion for judgment of acquittal on those counts and then reversing itself on that ruling; (4) by refusing to instruct the jury that the Government is required to prove knowledge of obliteration to prevail on the firearms charge, and by failing to include in its instruction to the jury the definition of "obliteration" offered by the defendant; (5) by denying his motion for judgment of acquittal on the firearms charge on the grounds that the Government failed to prove one of the elements of the firearms offense, i.e., failure to prove the firearm had travelled in interstate commerce; (6) by refusing to permit the testimony of an expert witness for the defense who would have testified about cultural aspects of the use of firearms by young black males from urban areas; and (7) by denying the defendant's motion for judgment of acquittal on the grounds of insufficiency of evidence which was made at both the close of the Government's case and at the close of all evidence.

## I. VENUE AND JURY SELECTION

### A. *Background*

Before discussing the defendant's arguments regarding jury selection and the Court's denial of his motion for change of venue, it is important to set out the jury selection process undertaken in this case. Generally, this Court uses the Struck Method for selecting jurors in criminal trials.[1] In

---

1. Under the Struck Method a group of thirty two or more prospective jurors are called to participate in the voir dire process. Those individuals are selected randomly from a larger group of persons summoned from the community who comprise the venire. During voir dire questioning, which is principally conducted by the Court, the Court excuses those individuals whom it believes have responded to its questioning in such a manner as to suggest possible bias or prejudice and whom the Court believes could not sit as impartial jurors. When an individual is excused, another person from the venire is called to take his or her place in the voir dire process. Voir dire continues until the Court is satisfied that it has a group of thirty-two or more unbiased individuals from which a jury can be impanelled. The attorneys for each side then submit "for

this case, to accommodate defense requests for extra peremptory challenges, thirty-eight prospective jurors were needed to compose the group from which twelve jurors and four alternate jurors would ultimately be chosen. Because of the Court's earlier ruling that one of the counts in the federal indictment against Jerome Washington would be severed on the grounds of prejudicial spillover, and because of pre-trial publicity on this case, the Court deviated slightly from its normal course of voir dire in this case.[2] The severed count, Count 49, related to an alleged retaliatory shooting in which a young girl from the Burlington community was killed. Count 49 was the only count in the federal indictment which referred to the shooting. The shooting, however, also gave rise to state charges. Jerome Washington was charged with murder, attempted murder, and aggravated assault. He was convicted of those state charges one month prior to the commencement of this trial. This Court severed Count 49 just prior to trial to avoid any possible prejudice to Jerome Washington's co-defendants, in particular, any spillover effect from the guilty verdict. Having severed that count, the Court ruled that no evidence regarding the shooting would be admitted in the trial since it would be irrelevant to the remaining charges.

To maintain the integrity of these rulings, the jury selection process was altered to weed out those prospective jurors who: (1) either had knowledge of the guilty verdict in Jerome Washington's state murder trial, or (2) had formed an opinion about the federal case from their exposure to media accounts or conversations with others who knew about the state or federal case. The process was also designed to ensure that those with any prior knowledge of the case would not taint any other prospective juror by discussing what they knew.

The Court began the jury selection process in this case by assembling the venire which consisted of over 120 persons. The Court then described the charges and inquired of everyone called as a prospective juror whether they had any prior knowledge of the case. Those who responded that they knew nothing about the case were asked to retire to a separate room in the courthouse. Those who remained in the courtroom, *i.e.* those who had some knowledge about the case, were sequestered, instructed not to discuss the case amongst themselves, and were then individually questioned outside the hearing of all other prospective jurors regarding the nature, extent and source of their knowledge. They were also asked if they had formed an opinion as to the guilt or innocence of any of the defendants based on what they had heard. Any person who had heard about the related state murder trial and knew that Jerome Washington had been found guilty in that trial were excused, as were those persons who even though they may have had no knowledge of the state trial, had formed an opinion about the federal case which they could not lay aside based on what they had read, seen or heard from media accounts or friends.

After all of those persons with some prior knowledge of the case were individually questioned regarding that knowledge, those who had not been excused were joined with the group of prospective jurors who had no prior knowledge. Thus, the venire of prospective jurors at this juncture in the process consisted of persons who either knew nothing about this case or the related state murder trial, or who if they had some prior knowledge, did not know the nature of the state case or did not know the verdict in that case.

cause" challenges. After the Court rules on those challenges and replaces any individuals excused, the attorneys for each side submit peremptory challenges. Those persons challenged are excused. The first twelve prospective jurors left remaining in the group comprise the jury, with the next four in this case remaining as alternates.

2. Normally, the Court would call individual prospective jurors to sit in the jury box for voir dire.

After the individual names are called, each individual called is questioned by the Court regarding general background information, *e.g.*, name, residence, employment, etc. The Court then asks the members of the panel questions concerning their knowledge of the case or the parties and their attorneys as well as a number of other questions designed to ferret out possible prejudices.

At this point, the Court began its normal course of jury selection by calling forth thirty-eight persons from the venire for voir dire questioning. As the record will reflect, that questioning was conducted in a thorough and careful manner, and included questions intended to elicit racial animus if any, as well as beliefs or views on gun control laws and the use or distribution of illegal drugs. A number of persons were excused for cause as a result of their responses to some of the questions. In the end, this Court was convinced that the thirty-eight prospective jurors against whom peremptory challenges would be made were unbiased and either had no preconceived notion .as to the guilt or innocence of the defendants, or could lay aside anything they might have heard or seen about the case and serve as impartial jurors.

Having this process in mind, the Court now addresses the defendant's arguments that: (1) his motion for change of venue should have been granted; and (2) individuals with any knowledge of the state trial should have been excused by the Court for cause prior to peremptory challenges. The defendant actually blends his argument regarding change of venue because of pretrial publicity with his argument on the jury selection process. These concepts are distinct, however, and are treated separately below.

### B. *Change of Venue*

█ Rule 21(a) of the Federal Rules of Criminal Procedure requires a court, upon request by a defendant, to transfer a proceeding to another district "if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial" within that district. Fed.R.Crim.P. 21(a). In ruling on a motion pursuant to Rule 21(a) in cases involving claims of adverse pretrial publicity a court must determine whether negative publicity has so permeated the community with prejudice that there is a reasonable likelihood that the defendant's right to a fair and impartial jury has been compromised. *United States v. Maldonado–Rivera*, 922 F.2d 934, 966–67 (2d

Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2858, 115 L.Ed.2d 1025 (1991). The mere presence of adverse publicity is not determinative. Rather, the court should assess the "likely effect of the publicity on the ability of potential jurors in the district to hear the evidence impartially." *Id.* at 967.

█ Jerome Washington argues that since many prospective jurors were excused because they knew of the state trial and its outcome, and because an additional number knew of a state case but not necessarily its nature and outcome, the federal case against him fit the bill for a change of venue. I disagree. While it is true that many potential jurors had some knowledge of the federal or state case, or both, it is also true that a sufficient number had no such knowledge. More significantly, at the close of the voir dire, it was clear to the Court that pretrial publicity had not adversely affected the ability of those selected as potential jurors to hear the evidence in this case impartially. In addition, exposure to publicity about the case during the course of the trial was completely restricted. Each day, before the jury was excused for the day, the Court admonished them to avoid any media accounts or discussions with others concerning the case.

The Court firmly believes that there was no reasonable likelihood that the defendant's right to an impartial jury was compromised. Thus, a change of venue was not required to safeguard the defendant's Sixth Amendment right to a fair trial.

### C. *Jury Selection*

█ The defendant argues that the Court should have granted his "for cause" challenges against each potential juror who had any knowledge of the state case, regardless of whether those persons knew the outcome or nature of that case. He claims that those jurors would be influenced by knowledge which was extremely prejudicial to him and that, because of the Court's rulings, would not have the opportunity to hear testimony regarding the facts surrounding the shooting. If he remained silent about the shooting, the jurors with some knowledge would be left to speculate. If he introduced testimony regarding the shooting, he would open up an

extremely prejudicial area of evidence. In forcing him to choose between these two alternatives, the Court violated his Fifth Amendment right to due process.

The defendant's argument is flawed, however. There was no second alternative. The Court had ruled that no evidence of the shooting would be allowed because of its potential prejudicial spillover effect on Jerome Washington's co-defendants. Thus, Jerome Washington was forced to remain silent about that incident. The question becomes then, whether in light of that restriction, potential jurors with some knowledge of the state case should have been excused for cause.

"[C]hallenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality...." *Swain v. Alambama,* 380 U.S. 202, 220, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965), *overruled on other grounds, Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), sets forth the standard for determining whether a juror can be impartial in a case involving pretrial publicity:

> It is not required ... that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.* at 722–23, 81 S.Ct. at 1642.

At the time when the attorneys made their requests for challenges for cause in the case at bar, the Court had already made a preliminary determination that those who had not been excused could lay aside any impressions or opinions based on prior knowledge and render a verdict based only on the evidence presented during the trial. The defendant's for cause challenges based simply on the fact that a juror knew there was a related state case were insufficient to show a legally cognizable basis for partiality. Furthermore, the defendant did nothing to demonstrate the actual existence of an opinion of any of the jurors that would have raised a presumption of partiality. *See Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975) (no presumptive deprivation of due process where juror in state case exposed to information about defendant's prior convictions). His suggestion that the jury selection process did not comport with constitutional fairness and that it permits an inference of actual prejudice is unsupported.

Defendant's motion for judgment of acquittal, or in the alternative, for a new trial, on grounds that his motion for change of venue should have been granted and that the jury selection process was constitutionally unfair is denied.

## II. DOUBLE JEOPARDY

■ At the close of the Government's case, and outside the presence of the jury, the defendant moved for judgment of acquittal on all counts charged against him. With respect to two of the charges of actual distribution, Counts 7 and 10 in the Indictment, he argued that as a matter of law, the Government had submitted insufficient evidence on which to convict him of distribution on those dates. The Court agreed. The Government pointed out that judgment of acquittal was inappropriate because this was a drug conspiracy case and the *Pinkerton* theory of criminal responsibility would apply.[3] The

---

**3.** Under the *Pinkerton* theory, a co-conspirator may be held criminally responsible for substantive offenses committed by a co-conspirator. *United States v. Pinkerton,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489, *reh'g denied,* 329 U.S. 818, 67 S.Ct. 26, 91 L.Ed. 697 (1946); *United States v. Labat,* 905 F.2d 18, 23 (2d Cir.1990).

Court, however, ruled that *Pinkerton* was not applicable in this case and granted the defendant's motion as to Counts 7 and 10.

Trial resumed with a co-defendant calling his first witness. That witness' testimony had no bearing on the charges of actual distribution. The Court then recessed for a break. Following that break, the Court announced, outside of the hearing of the jury, that it had been mistaken when it ruled that *Pinkerton* would not apply in this case, and upon reflection, found that it would. On that basis, the Court reversed its earlier ruling on Counts 7 and 10.

The defendant immediately raised an objection and thereafter filed a memorandum in support of his position that the Court was barred from reversing its earlier ruling because to do so would subject the defendant to double jeopardy on those charges. The Court disagreed, citing a 1969 Second Circuit case, *United States v. Baker*, 419 F.2d 83, 89 (2d Cir.1969), *cert. denied*, 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (1970). In *Baker* the Second Circuit held that when a judgment of acquittal is granted and then reinstated during trial, and where both the initial decision and its recall were outside the hearing of the jury, there was no double jeopardy. *Id.* The only prejudice suffered was psychological;

> his hopes were first raised, then quickly lowered. But so ephemeral and insubstantial an injury is not proscribed by the Constitution.

*Id.* *Baker* is still good law, its rationale reasonable, and it is directly on point. The defendant's argument that the reasoning of *Baker* is inconsonant with language from a more recent Supreme Court decision, *Smalis v. Pennsylvania*, 476 U.S. 140, 144, 106 S.Ct. 1745, 1748, 90 L.Ed.2d 116 (1986), is a question which is best left to the Second Circuit.[4] In this Court's view, to construe the constitutional principles of double jeopardy to apply in the technical sense urged by the defendant here would be to exalt form over substance. Defendant's motion for judgment of acquittal on double jeopardy grounds is denied.

## III. THE FIREARMS CHARGE

■ The defendant challenges his conviction on the firearms charge. In Count 48 of the Indictment Jerome Washington was charged with possession of a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k). Section 922(k) provides:

> It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered *or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has at any time, been shipped or transported in interstate or foreign commerce.*

*Id.* (emphasis added). The defendant challenges his conviction on the section 922(k) offense on two grounds. First, he argues that the Government failed in its proof of one element of the offense, and thus, his motion for judgment of acquittal at the close of the evidence should have been granted. Second, he argues that the Court erred in instructing the jury on this charge because it failed to include the definition of "obliteration" proposed by the defendant, and because it failed to instruct the jury that the Government had the burden of proving that he knew the firearm had an obliterated serial number. Because the Court agrees that the defendant's earlier motion for judgment of acquittal on the firearms charge should have been granted, his second argument need not be addressed.

To prove a violation of section 922(k), the Government must prove three elements beyond a reasonable doubt: (1) that the defendant knowingly possessed a firearm on or about the date in question; (2) that the serial number of that firearm was obliterated; and (3) that the firearm travelled in interstate commerce. For this latter element, it is sufficient for the Government to prove that the firearm had at some point since the time of its manufacture, travelled across a state line. *Cf. United States v. McCarty*, 862 F.2d

---

4. The factual circumstances in the *Smalis* case do not stand on all fours with those in the case

before me;. *Baker*, on the other hand, is clearly analogous.

143, 145 (7th Cir.1988) (discussing section 922(g)). Thus, if it is shown that the gun was not manufactured in Vermont, but was possessed here, such proof is sufficient to sustain the Government's burden in proving it travelled across a state line.

At trial, however, the Government did not offer any proof that the firearm had travelled across a state line, nor did the Government offer evidence of its place of manufacture. At the close of the Government's case-in-chief the defendant argued that the Government had failed in its proof on this element. The Government took the position that the gun itself was sufficient proof as it was marked "Made in USA" on one side, and on the other side bore the name of the manufacturer with its Maryland address. At that time, the Court agreed with the Government's position. Upon reconsideration, however, that ruling cannot withstand the defendant's post-trial attack. The markings on the firearm in question did not prove that the gun was manufactured in a different state—they only establish that the manufacturer has a place of business in Maryland, and that the gun was manufactured in this country. There was no evidence on the gun itself as to where that particular firearm had been manufactured, nor was there evidence in any form that showed that guns are not manufactured in the State of Vermont. It is axiomatic that a conviction must rest solely on the evidence presented at trial. While jurors are encouraged to use common sense, this particular issue is not one which can be resolved solely by common sense. On the basis of the evidence in this case, as a matter of law, no rationale juror could find, beyond a reasonable doubt, that this gun had travelled across state lines. Defendant's motion for judgment of acquittal on Count 48 is granted.

## IV. THE EXPERT WITNESS

■ A trial judge has broad discretion in its determinations regarding the admission or exclusion of expert testimony. *Salem v. United States Lines Co.*, 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313, *reh'g denied,* 370 U.S. 965, 82 S.Ct. 1578, 8 L.Ed.2d 834 (1962). Under Federal Rule of Evidence 702, an expert witness may testify in the form of an opinion or otherwise if the Court finds that such testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue ..." Fed.R.Evid. 702.

During the trial in this case, a co-defendant made an application to the Court seeking government funds to obtain the services of an expert witness for use at trial. The defendant joined in that request. The expert witness, an urban sociologist, was expected to testify on the topic of cultural habits and traits of young black urban males with particular reference to the possession of firearms. The defendant is a young black male from an urban culture. The Court, however, denied the request to authorize the expenditure of government funds for this witness as it believed such testimony would not assist the jurors in this case in finding facts or understanding the evidence presented.

The defendant argues that this ruling was erroneous because the witness would have been useful in explaining why a person such as himself would be likely to possess firearms irrespective of any involvement in illegal drug activities. However, the firearms offense Jerome Washington faced was for the possession of an illegal firearm. The purpose of the defendant's possession of that firearm was irrelevant. The factual issues were simply whether he possessed a firearm with an obliterated serial number on the date alleged, and whether the firearm crossed state lines. The urban sociologist's testimony would not have assisted the jury in making these findings. In any event, given that the defendant's motion for judgment of acquittal on the firearms charge is granted herein, the request for a new trial based on an erroneous evidentiary ruling in regard to that charge is moot.

## V. SUFFICIENCY OF THE EVIDENCE

Finally, the defendant has moved for judgment of acquittal on all counts of conviction on the basis of insufficiency of the evidence. Since the Court has already decided that the Government failed in its proof on the firearms charge, that count is not addressed here. The remaining counts of conviction include the two counts of actual distribution

of cocaine, Counts 7 and 8, and a count of conspiracy to distribute cocaine, Count 1.

The defendant's burden on a motion for judgment of acquittal based on a claim of insufficiency of the evidence is a heavy one. *United States v. Strauss*, 999 F.2d 692, 693 (2d Cir.1993). He must convince the Court that there was "no evidence from which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Id.* (quotations omitted). Circumstantial evidence alone may support a conviction and all inferences are drawn in favor of the Government. *Id.*

To prove a drug conspiracy offense pursuant to 21 U.S.C. § 846, the Government must prove beyond a reasonable doubt that: (1) an agreement existed during the time in question between Jerome Washington and his alleged co-conspirators to distribute cocaine, and (2) that Jerome Washington knowingly and willfully became a member of that conspiracy. *United States v. Berkery*, 919 F.2d 817, 820 (2d Cir.1990). There was substantial evidence presented throughout the trial by several government witnesses from which the jury could reasonably infer that Jerome Washington was a member of a conspiracy to distribute drugs.

As to Counts 7 and 8, the substantive distribution charges, the defendant argues that there was insufficient evidence to prove that he, personally, distributed cocaine on February 21, 1993, and February 24, 1993, respectively. With regard to Count 8, he makes this assertion based on his perception and characterization of the Government's leading witness on the distribution counts, Allen Robertson. Credibility issues are resolved by the jury, not the Court. *Strauss*, 999 F.2d at 695. In his testimony during the trial Robertson, a government informant, implicated Jerome Washington as being the individual from whom he purchased cocaine

on both of the dates in question. On February 24, 1993, Robertson claimed that he used hand signals to convey to Jerome Washington the amount of cocaine he wished to purchase.[5] If the jury believed Robertson, this testimony alone was sufficient to convict the defendant on Count 8.

In addition, even if the jury found that Jerome Washington was not the individual who sold cocaine to Robertson on February 24, 1992, it could apply the *Pinkerton* theory to hold Jerome Washington criminally responsible for the sale that day. The Government presented the testimony of John Lewis, the government agent who met with Robertson immediately before and after the alleged transaction took place. That testimony, if believed, was clearly sufficient to support the Government's position that one of the alleged co-conspirators distributed cocaine on the dates in question. Under the *Pinkerton* theory, if the defendant was found to be a member of a conspiracy to distribute cocaine, he may be convicted on a charge of distribution even if the sale was conducted by a co-conspirator.[6]

The *Pinkerton* analysis can be applied to Count 7 as well. Count 7 charged that Jerome sold cocaine to Robertson on February 21, 1992. In his testimony, however, Robertson said he couldn't remember who sold him drugs that day. Even so, if the jury believed that one of the alleged co-conspirators distributed cocaine that day, Jerome Washington, as a member of that conspiracy can be held criminally liable. There was direct evidence from both Robertson and Lewis from which a rational juror could conclude, beyond a reasonable doubt, that a drug transaction took place on February 21, 1993, in the residence shared by the alleged co-conspirators. Accordingly, drawing all inferences in the light most favorable to the Government,

5. These purchases were controlled buys arranged and monitored by government agents. The alleged transaction on February 24, 1992, which was taped (Robertson wore a body wire during the alleged transactions) did not include any mention of a sale of cocaine.

6. To convict a defendant of a substantive offense under the *Pinkerton* theory, the jury must find: (1) the substantive distribution crime was committed; (2) the person who committed that crime was a co-conspirator; (3) the crime was committed pursuant to a common plan and understanding among the co-conspirators; (4) the defendant was member of that conspiracy at the time the crime was committed; and (5) the defendant could have reasonably foreseen that a co-conspirator would commit the crime. *United States v. Labat*, 905 F.2d 18, 23 (2d Cir.1990).

there was sufficient evidence on which to convict the defendant on Count 7.

### Conclusion

Defendant's motion for judgment of acquittal is hereby GRANTED as to COUNT 48, but DENIED as to COUNTS 1, 7 and 8. (Paper 59) Defendant's motion in the alternative for a new trial is DENIED. (Paper 59) This case is CLOSED.