**UNITED STATES of America, Appellee,**

v.

**Jerome STRAUSS and Adam Strauss, Defendants–Appellants.**

**Nos. 1461, 1462, Dockets 92–1764, 92–1765.**

United States Court of Appeals, Second Circuit.

Argued May 12, 1993.

Decided July 29, 1993.

Julia P. Heit, New York City, for defendants-appellants.

Emily Berger, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty., Susan

Corkery, Asst. U.S. Atty., E.D.N.Y., of counsel) for appellee.

Before MINER, McLAUGHLIN and FRIEDMAN,* Circuit Judges.

MINER, Circuit Judge:

Defendants-appellants Jerome Strauss ("Jerome") and Adam Strauss ("Adam") appeal from judgments of conviction entered on December 14, 1992 in the United States District Court for the Eastern District of New York (Mishler, *J.*). The Strausses were convicted, following a jury trial, on one count of conspiring to hold for sale misbranded and adulterated dog food, in violation of 21 U.S.C. §§ 343(a)(1) and 342(a)(1) and 18 U.S.C. § 371 and on twelve counts of causing false labels to be affixed to dog food with the intent to defraud and mislead, in violation of 21 U.S.C. §§ 331(k), 333(a)(2) and 343(a)(1). Jerome was sentenced to a term of imprisonment of twenty-seven months to be followed by three years of supervised release. Adam was sentenced to a one-year term of probation, four months of which were to be served under house arrest. On appeal, the Strausses principally contend that there was insufficient evidence to prove that they mislabeled or adulterated the dog food, and that, as applied to them, 21 U.S.C. § 343(a)(1) is unconstitutionally vague. For the reasons that follow, the judgments of conviction are affirmed.

## BACKGROUND

Bow Wow Meow Pet Food Stores ("BWM") was a chain of eleven pet food and pet accessory stores located throughout Nassau County, New York. Jerome was BWM's owner and president, and his son Adam became vice-president in 1991 after graduating from college. BWM sold a variety of nationally advertised baked kibble (crushed or broken up dry dog food), as well as its own brand of kibble called "Professional Choice," which it purchased from Triumph Pet Industries, Inc. ("Triumph"), a leading producer of kibble located in Hillburn, New York.

Jerome began purchasing kibble from Triumph around 1980. The kibble was packaged at Triumph's plant in bags designed by Jerome. Triumph manufactured twelve kinds of kibble. Eight kinds of kibble were formulated for particular ages, sizes or activity levels of dogs and included: (1) "Standard"; (2) "Lite & Lean"; (3) "Natural"; (4) "High Protein"; (5) "Original"; (6) "Special Puppy Blend"; (7) "Special Adult Blend"; and (8) "Special Senior Blend." Four kinds of kibble were artificially flavored and colored varieties of the Standard kibble and included: (9) "Milk–Beef–Liver"; (10) "Chicken–Beef–Cheese"; (11) "Egg–Beef–Cheese"; and (12) "Supreme Stew." Over the years, Jerome purchased Standard kibble (both flavored and unflavored), containing twenty-three percent protein; Lite & Lean kibble, containing twenty percent protein; Natural kibble, containing twenty-five percent protein; and High Protein kibble, containing thirty percent protein. Lite & Lean kibble was less expensive than Standard kibble because it contained less protein and was made from broken biscuits rejected by another customer of Triumph. High Protein kibble was the most expensive due to the additional protein.

All the kibble manufactured by Triumph contained the amount of fat and protein required by the Food and Drug Administration ("FDA") for a balanced and nutritional dog food. Pursuant to FDA requirements, the bags' labels listed the ingredients (e.g., wheat flour, meat and bone meal, poultry by-product and animal fat). *See* 21 C.F.R. § 501.4 (1992). The labels also included a chart comparing the FDA-recommended minimum requirements of protein, fat, vitamins, minerals and other nutrients with the average level of those nutrients contained in the packaged kibble. Also listed was the recommended serving size according to the weight of the dog to be fed.

Until 1985, Jerome bought only Standard kibble (including all of the artificially flavored and colored varieties). From 1985 to 1988, in addition to the Standard kibbles, he pur-

---

* The Honorable Daniel M. Friedman of the United States Court of Appeals for the Federal Circuit, sitting by designation.

chased High Protein kibble, Natural kibble and Lite & Lean kibble. In 1989 and 1990, Jerome bought only three varieties of kibble: unflavored Standard kibble; the Chicken–Beef–Cheese variation of Standard kibble; and Lite & Lean kibble. By 1991, he was purchasing only the unflavored Standard kibble and the Lite & Lean kibble. At no time did Jerome purchase any Special Puppy Blend, Special Adult Blend or Special Senior Blend kibble. Triumph's president, Isadore Gittelman, testified that he was not aware of significant nutritional differences among the various types of kibble sold to BWM and that the kibble was nutritionally adequate for all kinds of dogs.

All Professional Choice kibble was packaged in bags of the same design. A label was affixed to each bag indicating the age, size or activity level of the dog for which that particular kibble was manufactured. Until 1988 or 1989, Triumph would attach the labels prior to shipping the bags to BWM. To reduce its expenses, Triumph advised the Strausses that it would discontinue this practice. Thereafter, Triumph shipped unlabeled bags on pallets that identified the type of kibble (e.g., Standard or Lite & Lean) on each pallet. Labels would be affixed to the bags once they arrived at BWM's warehouse.

Gary Evers, a BWM store manager, testified that, under Jerome's supervision, he instructed BWM's warehousemen on the procedure for labeling the bags. Triumph delivered to BWM each month approximately 1000 pounds of kibble packaged in twenty- and forty-pound bags. As directed by Jerome, the warehousemen generally disregarded the type of kibble actually in the bags and affixed labels according to the weekly requests received from BWM stores for particular varieties of Professional Choice. Kibble that was identified by Triumph as "Original" would be labeled "Original," "High Protein," "Jumbo" and "All Natural." The kibble Triumph identified as "Chicken–Beef–Cheese" would be labeled "Chicken–Beef–Cheese," "Egg–Beef–Cheese" or "Milk–Beef–Liver." Finally, the kibble designated by Triumph as "Lite & Lean" was labeled "Lite & Lean," "Supreme Stew," "Special Puppy Blend," "Special Adult Blend" or "Special Senior Blend."

Several former employees of BWM testified at trial that Jerome instructed them to ascertain the type, age and activity level of a customer's dog and then to recommend the Professional Choice kibble appropriate for that particular canine. The government introduced testimony that, on at least one occasion, when an employee could not fill a customer's request, the store supervisor simply removed the label from a Professional Choice bag in stock and relabeled the bag as the variety requested by the customer. Indeed, when questioned by an employee regarding this practice, Adam allegedly responded that "it was just a marketing technique and basically people didn't know the difference." Moreover, in perhaps the first covert operation involving the purchase of dog food by the Federal Bureau of Investigation, special agents posed as customers at eight BWM stores. In each case, after discerning the size, age or activity level of the dog allegedly owned by the undercover agent, the BWM employee would recommend Professional Choice as the food best suited for that canine. The agent, relying on this representation, would purchase the kibble, even though it was not in fact specifically manufactured for the particular type of dog he described.

Finally, when the kibble became bug infested, store managers were instructed to return the bags to the BWM warehouse. There, the Strausses would remove the kibble, spray the food with Zema Home and Kennel Spray, let it dry, rebag the food and then return it to stock. Testimony by former employees of BWM revealed that hundreds of twenty- and forty-pound bags of kibble were treated in this manner. Marcia Van Gemert, Chief of Toxicology in the Health Effects Division of the Environmental Protection Agency, an expert on the effects of pesticides on animals, testified that the active ingredient in Zema is chlorpyrifos, a "very, very toxic chemical" in the chemical family of organophosphates. She further explained that organophosphates are chemicals that were first developed by the Nazis during World War II as nerve gas agents. Over the years, they have been developed and "chemi-

cally changed so they have different properties" and are now a common ingredient in pesticides.

On appeal, the Strausses claim that the evidence was insufficient to show that they misbranded or adulterated the dog food and that, as applied to them, 21 U.S.C. § 343(a)(1) is unconstitutionally vague. They also contend that Van Gemert's reference to the Nazis' development of organophosphates was so inflammatory that it constituted plain error and requires reversal of their convictions.

## DISCUSSION

### A. Sufficiency of the Evidence

The Strausses were convicted of knowingly and wilfully conspiring (1) "to cause false labels to be affixed to Professional's [sic] Choice dog food while the food was held for sale after shipment in interstate commerce, causing the food to be misbranded in violation of [21 U.S.C. §] 343(a)(1)"; and (2) "to cause insecticide to be sprayed on Professional's [sic] Choice dog food while the food was held for sale after shipment in interstate commerce, causing the food to be adulterated in violation of [21 U.S.C. §] 342(a)(1)." The Strausses contend that there was insufficient evidence to convict them of the conspiracy or of the substantive violations.

■ To set aside a jury verdict on the ground that there was insufficient evidence to establish the elements of a criminal offense, a defendant must demonstrate that there was no evidence from which a reasonable mind " 'might fairly conclude guilt beyond a reasonable doubt.' " *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir.1984) (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir.1972)). The burden placed on a defendant to meet this criteria is "very heavy." *United States v. Chang An–Lo*, 851 F.2d 547, 553 (2d Cir.), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). " '[W]e must credit every inference that could have been drawn in the government's favor.' " *United States v. Benitez*, 920 F.2d 1080, 1088–89 (2d Cir.1990) (quoting *United States v. Villegas*, 899 F.2d 1324, 1339 (2d Cir.), *cert. denied*, 498 U.S. 991, 111 S.Ct.

535, 112 L.Ed.2d 545 (1990)), and the government need not have "preclude[d] every reasonable hypothesis ... consistent with innocence." *Chang An–Lo*, 851 F.2d at 554. Finally, a conviction may be based upon circumstantial evidence and inferences based upon the evidence, *Mariani*, 725 F.2d at 865–66, and the jury is exclusively responsible for determining a witness' credibility, *United States v. Roman*, 870 F.2d 65, 71 (2d Cir.), *cert. denied*, 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989). The evidence here meets these standards of sufficiency.

### 1. Mislabeling the Dog Food

■ Section 343(a)(1) provides that food is misbranded if "its labeling [is] false or misleading in any particular." *See United States v. Hoxsey Cancer Clinic*, 198 F.2d 273, 281 (5th Cir.1952) (government not required to prove that each and every representation was false or misleading), *cert. denied*, 344 U.S. 928, 73 S.Ct. 496, 97 L.Ed. 714 (1953). Relying on Gittelman's testimony that Professional Choice was nutritionally adequate for all dogs, the Strausses contend that, because Professional Choice was in fact a single, all-purpose dog food, the application of labels indicating various kinds and flavors of kibble was not a false or deceptive practice. They argue that this practice was a marketing technique typically employed by other manufacturers and retailers of dog food.

Even if Professional Choice were nutritionally proper for all dogs, "the appropriate inquiry is whether the ultimate purchaser will be misled." *Libby, McNeill & Libby v. United States*, 148 F.2d 71, 74 (2d Cir.1945). It also is irrelevant that a reasonable consumer reading the labels would realize that all Professional Choice varieties, and indeed all other dog foods, contain roughly the same ingredients and that the artificial flavoring adds no nutritional value to the dog food. We have construed section 343 broadly, since the test is not the effect of the label on a reasonable consumer, but upon " 'the ignorant, the unthinking and the credulous' " consumer. *United States v. An Article ... Sudden Change*, 409 F.2d 734, 740 (2d Cir.1969) (quoting *Florence Mfg. Co. v. J.C. Dowd & Co.*, 178 F. 73, 75 (2d Cir.1910)). Here, an

ignorant, unthinking and credulous consumer would be misled into believing that he or she was purchasing a product designed especially for a dog of a particular age, size or activity level due to the Strausses' misbranding of the Professional Choice bags.

Finally, the "Guaranteed Analysis" (accurately listing the percentages of protein, fat, fiber and moisture content of the kibble) found on the Professional Choice bags does not detract from the deception caused by the Strausses' misbranding. Despite the fact that one part of the label was accurate, the other part was not, and the label as a whole falsely represented that the kibble was manufactured specifically for a particular type of canine. In *United States v. An Article of Food ... "Manischewitz ... Diet Thins",* 377 F.Supp. 746 (E.D.N.Y.1974), the defendant marketed matzoh crackers with a label bearing the name "Diet–Thins." In fact, the crackers in these boxes were no different from the defendant's "regular crackers." The defendant argued that it had not mislabeled its product because any customer who read the ingredients would see that the crackers were the same and because both kinds of crackers were appropriate for someone on a diet. The district court rejected these arguments, finding that "[i]t [was] not necessary to show that anyone was actually misled or deceived" and that "a technically accurate description of a food or drug's content may violate" the statute "if the description is misleading in other respects." *Id.* at 749. Similarly, although the "Guaranteed Analysis" portion of the labels technically may have been accurate, the labels were misleading and deceptive because they identified the kibble as being specifically manufactured for a dog of a certain age, size or activity level.

### 2. Adulteration of the Kibble

■ The Strausses also argue that there was insufficient evidence to show that they violated 21 U.S.C. §§ 331(k) and 342(a)(1). Section 331(k) provides, in relevant part, that adulterated food may not be "held for sale." Section 342(a)(1) provides, in relevant part, that "[a] food shall be deemed to be adulterated ... [i]f it bears or contains any poison-

ous or deleterious substance which may render it injurious to health." The Strausses admit that they adulterated the dog food, but they argue that the government failed to introduce direct evidence showing that they held any adulterated kibble for sale. They support this argument by asserting that the government provided no evidence that any adulterated kibble was ever sold to any customer of BWM. Proof of resale was not necessary, and we find that there was sufficient evidence for the jury to infer that the kibble was, in fact, held for sale. *See Mariani,* 725 F.2d at 865–66.

### B. Void for Vagueness

The substantive counts of the indictment charged that the Strausses,

> with the intent to defraud and mislead, unlawfully caused false labels to be affixed to Professional's [sic] Choice dog food while the food was held for sale after shipment in interstate commerce, causing the food to be misbranded in violation of [21 U.S.C. §] 343(a)(1), in that the labeling of the foods represented and suggested that the foods were different in nutritional value or flavor, whereas in truth and fact, the said foods were the same in both nutritional value and flavor.

The Strausses contend that section 343(a)(1) "is impermissibly vague as applied to [them]" because no guidelines or regulations govern dog food labeling and, accordingly, "they could not reasonably anticipate that marketing an all purpose dog food that meets the needs of dogs at all stages of life" would subject them to criminal liability. This argument has no merit.

■ To determine whether a statute is unconstitutionally vague as applied, a two-part test is used: a court must "first determine whether the statute 'give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and then consider whether the law 'provide[s] explicit standards for those who apply [it].'" *United States v. Schneiderman,* 968 F.2d 1564, 1568 (2d Cir.1992) (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972) (footnote omitted)), *cert. denied,* —— U.S. ——, 113

S.Ct. 1283, 122 L.Ed.2d 676 (1993). Because "the statute is judged on an as-applied basis," *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372 (1988), one whose conduct is clearly proscribed by a statute may not successfully challenge it for vagueness. *See Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n. 7, 102 S.Ct. 1186, 1191 n. 7, 71 L.Ed.2d 362 (1982). "Objections to vagueness ... rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard*, 486 U.S. at 361, 108 S.Ct. at 1857.

 Section 343 is a substantive offense under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–394 (the "FFDCA"). The Strausses' acts of affixing false labels to the Professional Choice bags violated both section 343(a)(1) and section 331, which lists the acts prohibited under the FFDCA. Included among these acts is the

> alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food ... if such act is done while such article is held for sale ... after shipment in interstate commerce and results in such article being adulterated or misbranded.

21 U.S.C. § 331(k) (1988). A violation of section 331 committed "with the intent to defraud or mislead" is a felony. *See* 21 U.S.C. § 333(a)(2).

The Strausses argue that the scienter requirement of section 333 does not save section 343(a)(1) from a vagueness challenge because the definition of "mislabel" is too broad. However, a " 'scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice ... that [the] conduct is proscribed.' " *Schneiderman*, 968 F.2d at 1568 (quoting *Hoffman Estates*, 455 U.S. at 499, 102 S.Ct. at 1193–94). In *Schneiderman*, we inferred a scienter requirement from the statutory provision limiting the definition of drug paraphernalia to those items "primarily intended or designed for use" with illegal drugs. *See id.* at 1566. Here, the scienter requirement need not even be inferred; it is plain from 21 U.S.C. § 333 that to be a felony, the misbranding must occur "with the intent to defraud or mislead."

The Strausses, relying on *Schneiderman*, also argue that because there are no regulatory standards or existing objective criteria in the dog food industry that focus on the labeling of dog food products "against which to measure possible violations of the law," *see id.* at 1568, section 343(a)(1) is unconstitutionally vague as applied, and the district court circumvented this issue by holding that the scienter requirement of section 333(a)(2) relieved them of meeting such a burden. In *Schneiderman*, we held that the Mail Order Drug Paraphernalia Control Act, 21 U.S.C. § 857, was not unconstitutionally vague as applied to the facts of that case because the statute included a scienter element and there were sufficient "guidelines ... to minimize the likelihood of arbitrary enforcement by providing objective criteria against which to measure possible violations of the law." *Id.* at 1568. These guidelines: (1) included fifteen examples of targeted paraphernalia; (2) listed eight factors to be considered, which logically were relevant to a determination of whether the defendant had the requisite scienter; and (3) included specific exemptions, which restricted the range of the statute and helped safeguard against discriminatory enforcement. *See id.* at 1569. Because seemingly innocuous items may be illegal in connection with the use of drugs, the list of targeted items "provid[es] objective criteria against which to measure possible violations" and the exemptions "help safeguard legitimate users of legal products." *Id.* at 1568. Here, legitimate sellers of dog food will find protection in the provisions in 21 U.S.C. §§ 333(a)(2) and 343(a)(1), even in the absence of guidelines or regulations, because the terms "intent to defraud and mislead" and "false and misleading" are commonly used words with definite meanings. Moreover, the FTC has promulgated regulations expressly forbidding the misrepresentation of a dog food's suitability for a particular purpose. *See* 16 C.F.R. § 241.4.

## C. Testimony of the Government Witness

 Finally, the Strausses argue that Van Gemert's reference to the Nazis' devel-

opment of organophosphates was so inherently prejudicial and inflammatory that no jury objectively could determine their guilt. Van Gemert testified that:

> [Organophosphates] ... were first developed during the second World War as nerve gas agents. The Nazis first started using them. And they were the ones who actually developed them. They are very, very powerful chemicals. They kill anything they come in contact with and that's why they were used very effective [sic].

Because they failed to object to this testimony, we can only reverse if the district court committed plain error. *See* Fed.R.Evid. 103(d).

The Strausses claim that the impact of Van Gemert's testimony was to portray them to the jury in the same light as the "hated Nazis" and that no valid reason existed to justify Van Gemert's statement. Thus, they argue that the plain error was "both obvious and substantial" and that comparing the Strausses' reputed acts with those of the Nazis was an error of "such horrendous proportions" that it would constitute a gross miscarriage of justice to turn a blind eye to its impact.

However, the comment was far more innocuous than claimed. Van Gemert did not "compare the Strausses' reputed acts with those of the Nazis," but rather recited the origins of a chemical component of the pesticide used by the Strausses. Given the context in which this statement was made and the evidence used to convict them, the Strausses have failed to show that this statement seriously affected the fairness, integrity or public reputation of the judicial proceedings or produced an unduly harsh result. *See United States v. Hutcher,* 622 F.2d 1083, 1087–88 (2d Cir.), *cert. denied,* 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980). Accordingly, this claim also is without merit.

## CONCLUSION

For the foregoing reasons, the judgments of the district court are hereby affirmed.