**Nigel NOBLE, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**93 UNIVERSITY PLACE CORPORATION, d/b/a Healthy Pleasures and Helene Burgess, Defendants.**

**No. 02 Civ.1803 SAS.**

United States District Court, S.D. New York.

Nov. 18, 2003.

---

60. *Id.*

61. *See* United States Marshals Service Report and Return, filed 11/16/01, Ex. F to Bhouraskar Damages Decl.

Karl J. Stoecker, New York, New York, for Plaintiff.

Michael J. Volpe, Shaffin A. Datoo, Clifton Budd & DeMaria, LLP, New York, New York, for Defendants.

### *OPINION AND ORDER*

SCHEINDLIN, District Judge.

Nigel Noble brings this action against 93 University Place Corporation, d/b/a Healthy Pleasures ("University") and Helene Burgess, alleging that: (1) University violated New York Labor Law Section 740 ("Whistleblower Law") by terminating No-

ble in retaliation for refusing to participate in and for complaining about the mislabeling of food; (2) University violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a)(1), by failing to pay overtime to Noble and other similarly situated employees; and (3) University violated New York Labor Law § 160 and 12 NYCRR § 142–2.2 by failing to pay overtime to Noble and other similarly situated employees. Noble brings the second cause of action as a collective action pursuant to 29 U.S.C. § 216(b), and the third cause of action as a class action pursuant to Fed. R.Civ.P. 23(a) and 23(b)(3) on behalf of all current and former employees of University who were not paid overtime.

University and Burgess move for summary judgment, contending that Noble's Section 740 claim must fail because Noble cannot establish: (1) that he was dismissed in retaliation for his complaints about mislabeling; or (2) an actual violation of a law that created and presented a substantial and specific danger to the public health and safety. University and Burgess also maintain that Noble's second and third claims both must fail because Noble is exempt from the overtime requirements of the FLSA and New York State law. Finally, University and Burgess contend that Noble's Section 740 claim against Burgess should be dismissed.[1]

Jurisdiction is based on the FLSA, 29 U.S.C. § 216(b), and 28 U.S.C. §§ 1331 and 1367(a). For the reasons stated below, defendants' motion is denied.

## I. BACKGROUND

### A. The Undisputed Facts

The parties agree on the following material facts: University is a New York corporation that owns and operates three retail natural food stores in New York City under the name "Healthy Pleasures." Complaint ("Compl.") ¶ 4; see 6/5/03 Defendants' Memorandum of Law in Support of Summary Judgment ("Defs.Mem.") at 1. Helene Burgess is the owner of University. See Defs. Mem. at 1.

In and around January or February 2001, University and Burgess hired Noble to work as a chef in the kitchen department at their 93 University Place location. Compl. ¶ 3; see 7/24/03 Affidavit of Nigel Noble ("Noble Aff.") ¶ 1; 9/18/02 Deposition of Nigel Noble ("Noble Dep. 1"), Ex. O to 6/5/03 Defendants' Notice of Motion for Summary Judgment ("Defs.Notice"), at 47. Noble was hired at an annual salary of $45,000. See Defendants' Local Civil Rule 56.1 Statement ("Defs.56.1") ¶ 3. After about three months' on the job, Noble's salary was increased to $48,000. See id. ¶ 4. Noble reported to Bashar Omar, the general manager of University's three stores, who in turn reported to Burgess. See 9/18/02 Deposition of Nigel Noble ("Noble Dep. 2"), Ex. J to 7/24/03 Declaration of Karl J. Stoecker, counsel for plaintiff ("Stoecker Decl."), at 39; 2/12/03 Deposition of Bashar Omar ("Omar Dep."), Ex. P to Defs. Notice, at 5.

In the first week of his employment, Noble complained to Omar that the store sold mislabeled food. See Defs. 56.1 ¶ 35. In particular, Noble alleged that the labels of salad bar items omitted ingredients and that the labels of non-salad bar items listed ingredients that were not contained in the food. See id. ¶¶ 36–37.

About seven or eight months later, in and around August 30, 2001, Omar con-

---

**1.** University and Burgess raise two further issues: (1) that two party plaintiffs who "opted-in" to the FLSA action should be dismissed, and (2) that plaintiff is not entitled to a jury trial. Because these issues are inappropriately raised on a summary judgment motion, I will not address them here.

fronted Noble with the fact that he had found perfectly good chickens in the garbage, and that he had been informed that Noble had instructed someone to throw away the chickens. *See id.* ¶¶ 40–41, 49. Omar then fired Noble. *See* Noble Dep. 1 at 9. Noble packed up his belongings and left the store. *See id.* at 11–12. Noble filed the instant action on March 6, 2002. *See* Defs. 56.1 ¶ 57.

## B.  The Disputed Facts

The parties disagree on material facts related to two key issues in this case. *First,* they dispute material facts in connection with the scope of Noble's duties and authority during his employment, and the terms of Noble's compensation. *Second,* they differ on events related to the alleged mislabeling practices.

### 1.  Noble's Duties, Authority, and Compensation

University and Burgess contend that Noble was hired as head chef and kitchen manager. *See id.* ¶ 1. They maintain that in these positions, Noble was in charge of a kitchen staff of between ten to twenty employees, and that the cooks and dishwashers reported directly to him. *See id.* ¶¶ 7, 30, 33–34.

According to University and Burgess, Noble had a number of different duties related to the smooth running of the whole kitchen, including: (1) scheduling kitchen employees; (2) ordering food for the kitchen; (3) keeping track of kitchen inventory; (4) planning the daily menu; (5) creating new dishes; (6) giving daily instructions and delegating work to the kitchen staff; (7) keeping track of the amount of food leaving the kitchen; (8) training new kitchen employees; (9) interviewing job applicants; and (10) acting as liaison between the kitchen department and Omar. *See id.* ¶¶ 8–19.

In addition, University and Burgess claim that they gave Noble authority to hire, fire, and discipline employees, and that Noble had acted on this authority. *See id.* ¶¶ 20–26. They also allege that Noble had authority to approve overtime. *See id.* ¶ 29. They assert that as Noble was a managerial employee, he was exempt from the provisions of federal overtime laws. *See* Defs. Mem. at 17.

Noble contends that he was not hired as head chef or kitchen manager, but simply as a chef responsible for cooking and preparing food for the store's salad bar. *See* Plaintiffs' Counterstatement Pursuant to Local Rule 56.1 ("Pl. 56.1 Resp.") ¶ 1; Noble Aff. ¶ 1. He claims to have had no supervisory authority over other employees, and that cooks and dishwashers did not report to him. *See* Noble Aff. ¶ 8.

As a chef, Noble maintains that he devoted 75 to 100 percent of his time to cooking. *See id.* ¶ 2. Occasionally, however, Noble assisted with other tasks under the direction of Omar or other chefs, including: (1) rearranging schedules that Omar had previously written up when other kitchen employees called in sick or failed to show up for work; (2) re-ordering commonly used kitchen supplies from the store's regular vendors; (3) collaborating with Burgess, Omar, and the other cooks on the daily menu; and (4) writing up the daily menu. *See id.* ¶¶ 5–7. On a couple of instances, at Burgess' request, Noble spent a few hours explaining to new kitchen employees how certain dishes were prepared. *See id.* ¶ 9. Noble denies that he was responsible for tracking kitchen inventory, or that he gave daily instructions or delegated work to the kitchen staff. *See id.* ¶ 8.

Noble contends that Omar and Burgess retained control over the hiring and firing of kitchen employees and that he himself

had no authority to hire or fire anyone, or recommend that anyone be hired or fired. *See id.* ¶ 9; Pl. 56.1 Resp. ¶¶ 22–24; 26. He claims that he had rarely participated in the interview process and had never hired anyone. *See* Noble Aff. ¶ 9. He also maintains that he had never fired anyone and that Omar had regularly handled employee terminations. *See id.;* Pl. 56.1 Resp. ¶ 25. Further, he asserts that he never had the authority to approve overtime. *See* Noble Aff. ¶ 5.

Finally, Noble alleges that he, like all kitchen employees, was required to work sixty hours per week, but that neither he nor his fellow employees were ever paid overtime. *See id.* ¶ 2. On the contrary, his compensation, and that of other employees, was reduced when they worked less than sixty hours. *See id.* ¶ 3. Alternatively, he was compelled to make up time that he had missed in order to avoid a reduction in pay. *See id.* ¶ 4.

## 2. Mislabeling Practices and Related Events

Noble alleges that University and Burgess falsely represented their food products as being "organic," "natural," or "homemade" and charged customers a higher price than is ordinarily paid for comparable regular foods. Compl. ¶¶ 13–14. For example, University's website stated that "every item is all natural and free of any artificial ingredients, preservatives, or unhealthy oils and seasonings." *See* Noble Aff. ¶ 10.

In fact, Noble maintains, most of the food sold at University's stores was regular food purchased in bulk from wholesale food companies and then repacked or relabeled by store employees. *See id.* ¶ 15. The new labels would omit ingredients deemed to be deleterious, such as preservatives, salt, sugar, refined flour, certain vegetable oils and transfats, and flavor enhancers. *See id.* For example, turkey meatballs sold at University's salad bar were purchased by the case from a bulk distributor and were originally labeled as containing preservatives and flavor enhancers. Compl. ¶ 17. The label University placed above this item on its salad bar, however, omitted any reference to these ingredients. *Id.* University purchased frozen cakes and pies from Sisco and sold them as "homemade." *Id.* ¶ 21. On its own labels for these products, University then substituted the highly saturated vegetable oils listed on the Sisco labels with oils lower in saturated fat. *Id.* University also re-packaged regular chickens and sold them as "free range." *Id.* ¶ 23.

Deceptive labeling practices also applied to food prepared in the stores. *See id.* ¶ 20. For example, Noble claims that he listed salt and sugar as ingredients for food that he had prepared for the salad bar, but that Omar instructed store employees to omit salt and sugar from the salad bar labels. *See id.*

Noble claims that this mislabeling endangered the health or even the lives of University's customers, many of whom were attracted to the company's stores because they maintained strictly regimented diets, often at the direction of their physicians. *See* Noble Aff. ¶¶ 12, 14. Apart from his initial complaints in the first week of his employment, Noble asserts that he repeated his complaints about the mislabeling on several occasions over subsequent months. *See id.* ¶ 16. One occasion was after a customer complained to him about having developed an allergic reaction to the turkey meatballs sold at the salad bar. Compl. ¶¶ 17–18. At the customer's demand, Noble informed her that the meatballs contained preservatives and flavor enhancers. *See id.* ¶ 18. When Noble complained to Omar about this incident, Omar told Noble that he

should not speak with customers about the store's products, and that he was to have no further contact with customers. *See id.* ¶ 19.

Apart from acknowledging that Noble had complained to Omar about the store selling mislabeled food in his first week of employment, University and Burgess deny all Noble's other allegations. *See* Defendants' Answer ("Ans.") ¶¶ 12, 24.

## C. Unemployment Insurance Proceedings

Shortly after Omar terminated Noble's employment with University, Noble applied for unemployment insurance benefits with the New York State Department of Labor ("DOL"). *See* Defs. 56.1 ¶ 43. Because both parties present incomplete and somewhat different versions of the administrative proceedings following Noble's application, I relate these facts separately in this section in order to present a coherent account of these events.

Noble applied for unemployment insurance benefits with the DOL sometime in October 2001. *See id.* In December, the DOL rejected Noble's application on the basis that Noble had quit his job without good cause. *See id.* ¶ 44.

Noble then applied to re-open the initial determination by the DOL and a hearing was held before Administrative Law Judge ("ALJ") Benjamin H. Reyes on January 18, 2002. *See id.* ¶¶ 45–46; 1/18/02 Transcript of DOL Hearing ("1/18/02 DOL Tr."), Ex. D to Defs. Notice, at 1. At that hearing, Noble appeared with counsel. *See* Defs. 56.1 ¶ 47. University and Burgess appeared without counsel and chose not to participate.[2] *See id.* ¶ 48. Noble testified under oath that Omar had fired

him for having instructed someone to throw away perfectly good chickens, but that the chickens were still on the pans in which they had been cooked, and did not appear to have ever been moved. *See id.* ¶ 49. ALJ Reyes found that Noble had not ordered anyone to throw away the chickens and that he did not voluntarily leave his job. *See* 1/18/02 Decision of Unemployment Insurance Appeal Board, Ex. G to Defs. Notice, at 1. The ALJ then overruled the initial determination and granted Noble unemployment insurance benefits. *See* Defs. 56.1 ¶ 50.

In October 2001, following the advice of the DOL, Noble had also applied for unemployment benefits with the Vermont Department of Employment and Training ("DMT") on the basis that he had lived there in the prior fiscal year. *See* 5/10/02 Transcript of DOL Hearing ("5/10/02 DOL Tr."), Ex. H to Stoecker Decl., at 14. On October 25, 2001, the DMT issued an initial ruling that Noble was eligible for unemployment compensation. *See* 3/11/02 Letter From Michael Volpe, Attorney for Defendants, to ALJ Reyes ("Volpe Ltr."), Ex. D to Stoecker Decl., at 1–2.

University and Burgess appealed the DMT's decision and on November 26, 2001, a telephone hearing was held at which they were present. *See* 3/11/02 Transcript of DOL Hearing ("3/11/02 DOL Tr."), Ex. C to Stoecker Decl., at 7–8. Noble was not present because he had not received timely notice of the hearing owing to delays in the mail service following the events of September 11, 2001. *See id.;* Stoecker Decl. ¶ 11. After the hearing, the DMT reversed its initial determination, finding that Noble had voluntarily left his employment because of criticism from his employer. *See* Volpe Ltr. at 2.

---

2. At this and subsequent hearings, University was represented by Bashar Omar. *See* 1/18/02 DOL Tr. at 1.

Subsequently, University and Burgess applied to re-open the New York DOL case and requested a hearing. *See* Defs. 56.1 ¶ 51. On February 27, 2002, the DOL sent the parties notice of a hearing to be held on March 11, 2002. *See* 2/27/02 DOL Notice of Hearing, Ex. F to Stoecker Decl. Noble's attorney requested an adjournment of the March 11 hearing because Noble had moved to North Carolina on or about March 7, 2002 and would be unable to attend. *See* Stoecker Decl. ¶ 10. Nonetheless, on March 11, 2002, a second hearing was held before ALJ Reyes at which University and Burgess appeared with counsel but neither Noble nor his counsel appeared. *See id.* ¶¶ 53–54; 3/11/02 DOL Tr. at 1. At that hearing, University and Burgess argued that the Vermont DMT's decision denying Noble unemployment benefits should be given preclusive effect under the doctrine of collateral estoppel.[3] *See* 3/11/02 DOL Tr. at 5–6. ALJ Reyes concluded that both parties had been given full due process at the DMT telephone hearing and that he was therefore bound by the DMT's findings of fact. *See* 4/12/02 Decision of Unemployment Insurance Appeal Board, Ex. I to Defs. Notice, at 2. He then sustained the DOL's initial determination denying Noble unemployment insurance benefits. *See id.*

On receipt of the DOL's decision, soon after he had filed the instant action, Noble again applied to re-open the DOL case and requested a third hearing. *See id.* ¶¶ 56–57; Stoecker Decl. ¶ 17. In response to Noble's application, a third hearing was held on May 10, 2002 before ALJ Reyes. *See* 5/10/02 DOL Tr. at 1. Noble was present with counsel; University and Burgess did not appear, but were represented by

counsel. *See id.* The only issues addressed at this hearing were whether Noble's application to re-open the DOL case should be granted and, if so, whether the Vermont DMT decision should be given collateral estoppel effect. *See* Stoecker Decl. ¶ 19. The merits of Noble's claim were not addressed. *See id.* ALJ Reyes then adjourned the hearing to give Noble an opportunity to address the issue of collateral estoppel in writing. *See id.* ¶ 20.

On June 24, 2002, the adjourned hearing was held at which University and Burgess appeared with counsel. *See* 6/24/02 Transcript of Adjourned DOL Hearing ("6/24/02 DOL Tr."), Ex. I to Stoecker Decl., at 1. Noble, who had been unable to obtain leave from his employer in North Carolina, was not present but was represented by his counsel. *See id.* at 1, 7. After Omar and Burgess had testified and been cross-examined by Noble's counsel, ALJ Reyes again adjourned the hearing to give Noble the opportunity to testify by telephone as to the merits of his claim. *See id.* at 10–61. After this, the record is silent as to whether Noble subsequently testified or whether the re-adjourned hearing ever took place.

On October 16, 2002, ALJ Reyes issued his decision sustaining the DOL's initial determination denying Noble unemployment insurance benefits. *See* 10/16/02 Decision of Unemployment Insurance Appeal Board, Ex. E to Defs. Notice, at 2. On the issue of collateral estoppel, ALJ Reyes explained that because Noble had been absent from the Vermont DMT telephone hearing owing to lack of notice, he had been denied his due process rights. *See id.* Accordingly, ALJ Reyes held that he was not bound by the DMT's factual find-

---

**3.** Counsel for University and Burgess had previously outlined these arguments in a letter brief submitted to ALJ Reyes. *See* 3/11/02 DOL Tr. at 4. In that letter, counsel stated

that Noble, as well as University and Burgess, had been present at the Vermont DMT telephone hearing. *See* Volpe Ltr. at 2.

ings. *See id.* Nonetheless, ALJ Reyes concluded that Noble should be denied unemployment benefits because he had resigned his job in response to legitimate and reasonable criticism by his general manager. *See id.* ALJ Reyes referred in his findings of fact to an incident on August 30, 2001, when Omar had admonished Noble about rotten chicken in and water on the floor of the kitchen's walk-in refrigerator.[4] *See id.* at 1.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is permissible "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is genuine 'if the evidence is such that a jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is material when "it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.2002) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, he "'must do more than simply show that there is some metaphysical doubt as to the material facts,'" *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), and he "'may not rely on conclusory allegations or unsubstantiated speculation.'" *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001) (quoting *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998)). *See also Gayle,* 313 F.3d at 682. Rather, the non-moving party must produce admissible evidence that supports his pleadings. *See First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor. *See Niagara Mohawk,* 315 F.3d at 175. Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Summary judgment is therefore inappropriate "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel,* 310 F.3d at 286 (citing *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000)).

## III. DISCUSSION

### A. Retaliatory Discharge Claim

Noble alleges that University and Burgess violated New York Labor Law Sec-

---

4. Neither party mentions the rotten chicken or the wet floor in its Local Civil Rule 56.1

statements or memoranda of law submitted in connection with the instant action.

tion 740 by terminating his employment because he complained about and refused to participate in the mislabeling of food. Section 740(2) provides:

> An employer shall not take any retaliatory personnel action against an employee because such employee ... (a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety ... (c) objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation.

N.Y. Labor Law § 740(2) (McKinney 2002). Section 740 affords the employer a defense based on the fact that the personnel action "was predicated upon grounds other than the employee's exercise of any rights protected by this section." N.Y. Labor Law § 740(4)(c) (McKinney 2002).

The provisions of Section 740 have been strictly construed. *See Rosario v. Nat'l Hous. P'ship Prop. Mgmt., Inc.*, No. 96 Civ. 4633, 1998 WL 146207, at *4 (S.D.N.Y. Mar.26, 1998). The employee must prove that his complaints or refusals to participate were in response to "an actual violation of a relevant law, rule, or regulation." *Dougherty v. Mem'l Sloan–Kettering Cancer Ctr.*, No. 00 Civ. 4083, 2002 WL 1610916, at *4 (S.D.N.Y. July 22, 2002) (citing *Bordell v. Gen. Elec. Co.*, 88 N.Y.2d 869, 870, 644 N.Y.S.2d 912, 667 N.E.2d 922 (1996)). The employee's "good faith, reasonable belief that such a violation has occurred is insufficient to invoke the statute's protection." *Id.* (citing *Bordell*).

University and Burgess argue that Noble has failed to establish a violation of Section 740 for the following reasons: *First,* Noble is unable to establish a causal nexus between his complaints and termination because his complaints in the first week of his employment were too far removed in time from his discharge seven or eight months later. *See* Defs. Mem. at 7–9. *Second,* Noble is collaterally estopped from relitigating the DOL's determination that he had voluntarily left his employment with University. *See id.* at 9–13. *Third,* Noble cannot establish an actual violation of a law, rule, or regulation. *See id.* at 13–15. *Fourth,* assuming that University and Burgess did mislabel food in violation of a law, rule, or regulation, such a violation does not threaten the health and safety of the public. *See id.* at 15–16.

None of these arguments is persuasive. *First,* it is questionable whether Noble bears the burden of establishing a causal nexus between his complaints and termination on a Section 740 claim. University and Burgess cite two cases for this proposition, but neither case directly addresses the merits of a Section 740 claim. In one case, *Sumner v. United States Postal Serv.,* the plaintiff had brought his retaliatory discharge action under Section 704(a) of Title VII of the Civil Rights Act of 1964. *See* 899 F.2d 203, 208 (2d Cir.1990). In the other case, *Scheiner v. New York City Health and Hosps.,* the defendants raised the issue of a causal connection in relation to the plaintiff's First Amendment claim. *See* 152 F.Supp.2d 487, 494–95 (S.D.N.Y. 2001). The defendants in that case then asserted that the same test should be applied to plaintiff's retaliatory discharge claim brought under New York Civil Service Law § 75–b, New York's public sector counterpart to Section 740. *See id.* at 503; *Bordell,* 88 N.Y.2d at 871, 644 N.Y.S.2d 912, 667 N.E.2d 922. As the *Scheiner* court had already found that there were genuine issues of material fact with respect to the First Amendment claim, the court concluded that there were also genuine issues of material fact with respect to

the Section 75–b claim without addressing the merits of the latter claim. Thus, neither case firmly supports defendants' contention that Noble must show a causal connection. Indeed, the affirmative defense afforded employers under Section 740(4)(c) indicates that the burden of proof lies with the employer to show a lack of causal connection between the employee's protected conduct and the employer's adverse personnel action.

■ Even if, however, the plaintiff must show a causal connection, Noble has raised genuine issues of material fact that his termination was prompted by his complaints to Omar about the mislabeling of food. He maintains that he complained repeatedly over several months, not just in his first week. He also claims, in relation to the incident involving the turkey meatballs, that Omar had reprimanded him for speaking to customers about the store's products, and had forbidden him from having further contact with customers. These allegations, if true, are sufficient to raise material issues of fact with regard to a causal connection between Noble's complaints and termination. *See Rosario,* 1998 WL 146207 at *5 (finding that plaintiff's complaints to his employer about housing violations and his supervisor's response that repairs to tenant units were not plaintiff's concern presented sufficient evidence to establish triable issues of fact).

■ *Second,* Noble is not collaterally estopped from relitigating the DOL's determination that he had voluntarily left his employment with University because he has raised issues of material fact as to whether he had a full and fair opportunity to contest that decision. Surely, it is well-settled under New York law that collateral estoppel "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party

. . . whether or not the tribunals or causes of action are the same." *Burgos v. Hopkins,* 14 F.3d 787, 792 (2d Cir.1994) (quoting *Ryan v. New York Tel. Co.,* 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 467 N.E.2d 487 (1984)). Two requirements must be met, however, before collateral estoppel applies: "(1) there must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and (2) there must have been a full and fair opportunity to contest the decision now said to be controlling." *Id.* (quoting *Schwartz v. Pub. Adm'r,* 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969)) (internal quotation marks and alteration omitted).

University and Burgess rightly point out that the critical issue decided in the DOL proceeding—whether Noble voluntarily left employment without good cause—is decisive of his Section 740 claim because an essential element of this claim is whether he suffered a retaliatory discharge. There is no evidence, however, that Noble ever testified as to the merits of his claim for unemployment benefits subsequent to the June 24, 2002 DOL hearing despite the ALJ's determination that he should be given the opportunity to do so. The absence of evidence is particularly troubling in light of the fact that the ALJ reached his October 16, 2002 decision denying Noble benefits on different facts from those presented by the parties in this action. The ALJ found that Noble had left his employment after Omar legitimately and reasonably criticized him about rotten chickens and a wet floor in the kitchen walk-in refrigerator. Now, however, the parties assert that Noble had left his job after Omar accused him of instructing someone to throw out perfectly good chickens. When the ALJ considered these facts in his January 18, 2002 decision, he had found that Noble had *not* voluntarily left his job.

Under these circumstances, it cannot be said that Noble had a full and fair opportunity to contest the ALJ's most recent decision.

*Third,* Noble has offered sufficient evidence to raise triable issues as to whether defendants' mislabeling practices violated 21 U.S.C. § 331. Section 331 prohibits the "misbranding of any food ... in interstate commerce." *See* 21 U.S.C. § 331(b). The statute is intended to "safeguard the consumer from the time the food is introduced in interstate commerce and delivered to the ultimate consumer." *United States v. Wiesenfeld Warehouse Co.,* 376 U.S. 86, 91–92, 84 S.Ct. 559, 11 L.Ed.2d 536 (1964). The relevant inquiry is whether an "ignorant, ... unthinking and ... credulous" consumer would be misled by a false label. *United States v. Strauss,* 999 F.2d 692, 696 (2d Cir.1993). "It is not necessary to show that anyone was actually misled or deceived, or that there was any intent to deceive." *United States v. An Article of Food ... Manischewitz ... Diet Thins,* 377 F.Supp. 746, 749 (E.D.N.Y.1974); *accord Strauss,* 999 F.2d at 697.

Noble's allegations that University and Burgess, purchased regular food in bulk from wholesale companies and then relabeled them, omitting ingredients deemed to be deleterious, are sufficient to raise genuine issues of material fact that the mislabeling violated Section 331. In *Strauss,* this Circuit upheld the defendants' convictions under Section 331 for mislabeling dog food. *See* 999 F.2d at 696–97. The defendants had purchased cheap kibble from a manufacturer, and then labeled it as more expensive varieties formulated specifically for particular canines. *See id.* at 694–95. The court rejected the defendants' arguments that cheap and specialty kibble contained approximately the same ingredients. *See id.* at 696. In *An Article of Food,* the court

found a violation of Section 331 when the defendant packaged ordinary matzo crackers as "Diet–Thins." *See* 377 F.Supp. at 749. The court reasoned that diet conscious consumers would be misled into thinking that the Diet–Thin matzos contained fewer calories than ordinary matzo crackers. *See id.* In the instant case, a credulous consumer would believe that food labeled as "organic" or "natural," or from which deleterious ingredients had been omitted, is healthier than regular food, particularly when sold in a natural food store.

*Fourth,* University and Burgess' contention that the mislabeling of food does not threaten the health and safety of the public is meritless in light of this court's holding, in an analogous claim of false advertising, that "false advertising involving diet and food ... clearly would involve a public harm if proved." *Weight Watchers Int'l, Inc. v. Stouffer Corp.,* 744 F.Supp. 1259, 1285 (S.D.N.Y.1990) (discussing claim of false advertising under New York General Business Law Section 349(a) which requires showing of consumer injury or harm to the public interest). Further, Noble has raised material issues in this regard in his allegation that a customer complained to him that she suffered an allergic reaction to turkey meatballs, where the preservatives and flavor enhancers had been omitted from the item's label.

In sum, because Noble has raised triable issues of fact, summary judgment on the Section 740 claim is denied.

### B. Overtime Compensation Claims

■ Noble alleges that University and Burgess did not pay him overtime in violation of the FLSA and New York Labor Law. University and Burgess claim that Noble was a managerial employee and thus exempt from the provisions of federal

and state overtime laws. *See* Defs. Mem. at 17.

The FLSA and New York state labor laws entitle employees to time-and-a-half overtime for hours worked in excess of forty hours per week. *See* 29 U.S.C. § 207(a)(1); N.Y. Labor Law § 160; 12 NYCRR § 142–2.2. The federal and state statutes, however, exempt those employees "employed in a bona fide executive, administrative, or professional capacity." *See* 29 U.S.C. § 213(a)(1); 12 NYCRR § 142–2.2 (adopting exemptions of the FLSA). "Exemptions to the FLSA are 'narrowly construed against the employers seeking to assert them.'" *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 222 (2d Cir. 2002) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960)).

The regulations promulgated by the Secretary of Labor pursuant to 29 U.S.C. § 213(a)(1) define which employees are "bona fide executives." Employees earning $250 or more per week must satisfy the following requirements: (1) their "primary duty" must be management; and (2) they must regularly direct the work of two or more employees. 29 C.F.R. § 541.1(f).

It is apparent that Noble, whose starting salary was $45,000 per year-later increased to $48,000 per year-falls within the category of those employees who earn $250 or more per week. University and Burgess argue that Noble's duties as head chef and kitchen manager included many managerial responsibilities, including supervising a staff of between ten and twenty employees. Noble contends, to the contrary, that he was simply a chef who spent 75 to 100 percent of his time cooking, and that he had no supervisory authority over other employees. Because the parties disagree on the scope of Noble's duties, there are disputed material issues of fact with respect to Noble's exempt status. Accord-

ingly, summary judgment on Noble's claims for overtime compensation is denied.

## C. Dismissal of Section 740 Claim Against Burgess

University and Burgess contend that Noble was an employee of University, not Burgess. *See* Defs. Mem. at 24. If they are correct, Noble's Section 740 claim against Burgess must be dismissed.

Section 740(1)(b) defines an employer as "any person, firm, partnership, institution, corporation, or association that employs one or more employees." N.Y. Labor Law § 740(1)(b). This circuit has also set forth an "economic realities" test to determine whether a given individual is an employer. The relevant factors under this test include: "whether the alleged employer (1) had the power to hire and fire the employees, [and] (2) supervised and controlled employee work schedules or conditions of employment." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir.1999) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir.1984)) (internal quotation marks omitted).

■ Burgess is the Chairman of the Board of University, and owns 100 percent of its outstanding stock. Compl. ¶ 6. Moreover, Noble asserts that Omar reported to Burgess, and that Burgess retained supervisory, hiring, and firing powers over the employees at University's stores. Under the economic realities test, it is therefore inappropriate to dismiss Burgess as a defendant in Noble's Section 740 claim.

## IV. CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is denied. A conference is scheduled for 10 a.m. on December 1, 2003, in courtroom

15C. The parties are to attend the conference with their respective counsel.