**Opinion issued June 21, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00482-CR

———————————

**SAMUEL QUINTANILLA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Case No. 1413930**

---

## O P I N I O N

A jury convicted appellant Samuel Quintanilla of attempted burglary of a habitation, a third degree felony. *See* TEX. PENAL CODE §§ 15.01(a), (d); 30.02(a), (c)(2). Quintanilla pleaded true to one felony enhancement, and the jury sentenced him to 12 years' imprisonment. In one issue on appeal, Quintanilla contends that

the trial court erred and violated the Double Jeopardy Clause of the United States Constitution by entering judgment on the jury's guilty verdict after first orally granting, and then denying, his motion for directed verdict. We affirm.

## Background

Iesha Tanner was at home with her three-year-old twin boys when she heard a tapping sound from the boys' bedroom. When she investigated, she discovered a man attempting to pry open the window. Tanner confronted the man and called 9-1-1. Based on the description Tanner gave, the police apprehended Quintanilla, who was later identified by Tanner in a photo lineup. Quintanilla was charged with attempted burglary of a habitation. The indictment read:

> The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, SAMUEL QUINTANILLA, hereafter styled the Defendant, heretofore on or about JANUARY 9, 2014, did then and there unlawfully, intentionally, with the specific intent to commit the offense of BURGLARY OF A HABITATION of IESHA TANNER, hereafter styled the Complainant, do an act, to-wit, PRYING AT THE COMPLAINANT'S WINDOW WITH A PAIR OF PLIERS, which amounted to more than mere preparation that tended to but failed to effect the commission of the offense intended.

### State's case

At trial, Officer J. Rhodes of the Houston Police Department ("HPD") testified that he responded to Tanner's 9-1-1 call and took Tanner's statement. Tanner described the suspect as a Hispanic male between the ages of 18 and 25, 5'2" to 5'3", 130 to 135 pounds, with a moustache and light brown complexion, wearing

2

a gray hoodie and blue jeans. According to her statement, Tanner saw the suspect "standing outside the window and prying with a screwdriver, trying to get underneath the window ledge." Tanner asked the suspect, "What are you doing?," and he responded, "I'm here to see Dee." Tanner replied, "No, you're not. I know what you're trying to do," and turned around to call 9-1-1. Tanner turned back to the window and watched the suspect ride away on a bicycle with whitewall tires and large handlebars.

Approximately five hours after taking Tanner's statement, Officer Rhodes was on patrol and observed Quintanilla riding a bike. Quintanilla and the bike matched Tanner's descriptions. Rhodes detained Quintanilla and obtained his information, released Quintanilla, and passed Quintanilla's information on to Officer C. Zimzoras for further investigation.

Officer Zimzoras testified that she prepared a photo array that included Quintanilla. She contacted Tanner and asked Tanner to review it. Tanner identified Quintanilla.

Tanner testified that she was napping in the room next to her boys' bedroom when she heard a ticking sound that went on for 15 to 20 minutes. She opened the boys' bedroom door to investigate and saw a silhouette of a man at the window. Through the blinds, she could see the man trying to "pop [the window] up and push it up." She screamed and pulled open the blind, and saw that he "had a set of pliers

or a screwdriver" that he was using to try to pry open the window. She testified that she was focused on his face and that the item he had in his hands "could have been a screwdriver, pliers, whatever he had." She asked the man what he was doing and he told her "Dee told [me] to come here." She told him there was no Dee there and turned to call the police. Tanner called 9-1-1 and watched the man ride away on a bicycle. Officer Rhodes arrived and she provided him her statement.

Tanner testified that she was contacted by Officer Zimzoras a few days later. Zimzoras asked her some questions about the attempted burglary, and, among other things, Tanner told Zimzoras that the tool the burglar used "looked like a screwdriver." Tanner was asked whether, in any of her conversations with Rhodes or Zimzoras, she called the tool any name other than screwdriver. She responded:

> Yes. I thought—like I said, it looked like a screwdriver or a pair of pliers. I am not sure which one it was, ma'am. I had my eyes on him. He did have an object in his hand. It looked like a screwdriver or a pair of pliers. I don't know what it was, but I do know he was using it to try and get in my window. My eyes were on him, totally on him.

On cross-examination, Tanner testified that the tool:

> was long and silver and looked like a screwdriver. It could have been a butter knife. I don't know what it was, sir. All I know, he had something in his hand to get in my window and I didn't know once he got in if he was going to use it on me.

Defense counsel also showed Tanner a screwdriver and various pliers, some of which she identified as screwdrivers and pliers and some of which she could not identify.[1]

Tanner testified that Zimzoras also showed her a photo lineup and asked her whether any of the people pictured was the person who had been prying at her window. Tanner identified one of the men pictured as the suspect. In court, Tanner again identified Quintanilla as the person who had been attempting to pry open her window.

*Motion for directed verdict*

At the close of the State's case, the jury was sent back to the jury room, and Quintanilla moved for a directed verdict. He argued that the indictment alleged that pliers were used in the attempted burglary, but Tanner testified that a screwdriver was used and, accordingly, there was insufficient evidence from which the jury could find beyond a reasonable doubt that pliers were the tool used in the attempted burglary. The State responded that Tanner testified that the tool was "like a screwdriver" and that it "could have been a pair of pliers." When Quintanilla's counsel asked if he could respond to this argument, the Court replied: "No. Your motion is granted."

---

[1] These items were not admitted into evidence and the record is not clear about how many or which items Tanner correctly identified.

The Court went on:

> All right. We'll bring the jury in—I don't recall her ever saying anything that she was—she stuck to her story a screwdriver. I mean, it's pled with pliers and I don't believe that was proven. I mean, I don't believe there was evidence in the record to support it.

The State responded that it believed the portion of the indictment alleging the use of pliers was surplusage, and the Court replied that it thought "the manner and means is just pled incorrectly." In response, the State suggested that it was a factual issue for the jury because Tanner had said "repeatedly that it could have been a screwdriver, it could have been pliers." The following colloquy ensued:

> The Court: But he held up a pair of pliers, and she didn't know what they were.
>
> The State: He did not—on the last pair of pliers, she said she knew what it was.
>
> The Court: She said pliers as far as she knew were some—let me take a look at the transcript, but I don't know. Hold on. Let me look. Give me a minute.

The record indicates that there was a brief pause and an off-the-record discussion. The Court then said:

> All right. I've gone back and looked through the transcript . . . when the first police officer testified as to what he learned. He referred to the tool being used as a screwdriver.
>
> . . .
>
> The issue of whether or not pliers—the word "pliers" is surplusage or it is necessary, I'm not going down that road. I'm simply going based on what's now on Page 96. There's a colloquy between

6

Mr. Merchant and the complaining witness over what is or is not a screwdriver and what is or is not pliers.

And in summary, she says, yes, she knows what pliers are. "They're things you squeeze together." She says, "The only thing I consider in my mind to be a plier would be what my daddy had, silver, you squeeze together, you twist bolts, you grab things like that."

But then when Defense counsel showed her a screwdriver as a demonstrative aid:

QUESTION: "Okay. That would be considered as a plier, and then the other one with the short—you know, a straight—"

"It's a screwdriver." ANSWER.

QUESTION: "And that would be a screwdriver; is that correct?"

ANSWER: "That's what I'm thinking in my head. When I say pliers, yeah, something that looked like that," referring to the screwdriver.

So as slim as this is, there is evidence in the record that while referring to a—looked like about a 5-inch flathead screwdriver that Defense brought in as a demonstrative aid, the complaining witness referenced that and said, "What I—what I'm thinking in my head. When I say pliers, yeah, something that looked like that."

So there was evidence in the record that she—and then later I believe she is educated by Defense counsel on the difference between pliers and she agrees the difference between pliers and screwdriver. But there is evidence in the record that she refers to the screwdriver as what she in her head believes is a pair of pliers or is pliers, a pair of pliers.

So I'm going to reverse myself basically based on that colloquy that there is enough evidence to go to the jury.

The Court then agreed with defense counsel that he could argue to the jury that the

State had not proven beyond a reasonable doubt that Quintanilla used pliers.

7

The jury charge conference was held, the jury was returned to the courtroom, and the defense rested. The parties gave their closing arguments, during which each focused on, among other things, whether the evidence showed that pliers were used in the attempted burglary.

### *Re-urged motion for directed verdict*

While the jury was deliberating, Quintanilla re-urged his motion for directed verdict. The parties reiterated their arguments about the sufficiency of the evidence and whether the indictment's language regarding pliers was surplusage. The Court said:

> All right. Okay. There is a case from the First Court of Appeals from '01, Garza v. State, where the Court says that surplusage language is not legally essential to constitute the offense alleged. However, there is an exception, when the needlessly pled language is descriptive of that which is legally essential to the charge, that is, when it defines the offense more narrowly, places it in a specific setting or describes the method of its commission, the State must prove that language.

> So unless you have something other than that, I'm prepared to bring the jury out and charge them to bring back an instructed verdict.

The State then reminded that judge that he had reviewed the record the previous day and determined that Tanner's testimony about the type of tool used was some evidence from which the jury could conclude beyond a reasonable doubt that pliers were used in the crime. The defense responded that Tanner's testimony was insufficient. The Court then stated:

8

I think this comes back to it doesn't matter from the perspective of the complainant. It's what the defendant is put on notice of. And I think it also comes down to just—the more I've looked into this, it's just a sufficiency of the evidence type deal; and the more cases I've looked at that discuss this type of issue, they've all been reversed. I mean, I can't find one that's upheld this sort of fine line sort of standard.

A lot of these cases have to deal with the State trying to abandon what they argued to be surplusage and the Court saying, no, you can't do that. You're making it more broader, and then it becomes a sufficiency of the evidence type deal. So unless y'all can show me something else, some case law, otherwise, I'm going to have Linda prepare a Judgment of Acquittal. So, all right.

The trial court took a brief recess, then came back on the record and the following colloquy occurred:

The Court: While we were preparing the motion, the jury rang with a verdict. I'm inclined to take that verdict, and we'll go from there.

Defense counsel: Just so that—

The Court: Yes.

Defense counsel: Just for appellate reasons, so the Court is denying both of my motions?

The Court: Yes.

Defense counsel: All right. Thank you, sir.

The jury found Quintanilla guilty. After hearing punishment evidence, the jury sentenced Quintanilla to 12 years' imprisonment, and the trial court entered judgment on the jury's verdict.

9

**Discussion**

In his sole issue, Quintanilla contends that his rights under the Double Jeopardy Clause of the United States Constitution were violated because the trial court accepted a guilty verdict after orally granting a directed verdict. The State contends that no double-jeopardy violation occurred because the trial court continued discussing the merits of the motion after its oral ruling and subsequently reversed its ruling, and denied Quintanilla's motion.

## A.     Standard of Review and Applicable Law

The Double Jeopardy Clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. "One of the most fundamental rules of double-jeopardy jurisprudence is that when a trial ends in an acquittal, the defendant may not be tried again for the same offense." *State v. Blackshere*, 344 S.W.3d 400, 406 (Tex. Crim. App. 2011).

In the double jeopardy context, determination of whether an acquittal has occurred is a question of law, and "is not to be controlled by the form of the judge's action," but instead by examining whether the judge's ruling, "whatever its label, actually represent[ed] a resolution, correct or not, of some or all of the factual elements of the offense charged." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571, 97 S. Ct. 1349, 1354–55 (1977), *cited in Holcomb v. State*, 445 S.W.3d 767, 777 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd); *see also*

10

*Benavidez v. State*, 323 S.W.3d 179, 181 (Tex. Crim. App. 2010) (observing that appellate court may order entry of judgment of acquittal only when either trial court's ruling amounts to de facto but unacknowledged acquittal or appellate court finds evidence is insufficient to support conviction). The determination of whether an acquittal occurred turns on "whether the judgment resolved any of the ultimate elements of the offense." *State v. Moreno*, 294 S.W.3d 594, 600 (Tex. Crim. App. 2009).

Although "finality will be accorded to a directed verdict based on a finding of insufficient evidence," "[d]ouble-jeopardy principles have never been thought to bar the immediate repair of a genuine error in the announcement of an acquittal . . . ." *Smith v. Massachusetts*, 543 U.S. 462, 474, 125 S. Ct. 1129, 1138 (2005); *Holcomb*, 445 S.W.3d at 780. Thus, "a prosecutor can seek to persuade the court to correct its legal error before it rules, or at least before the proceedings move forward." *Smith*, 543 U.S. at 474, 125 S. Ct. at 1138.

## B.     Analysis

At the close of the State's case, the trial court orally granted Quintanilla's motion for directed verdict, stating, "Your motion is granted." But the trial court then proceeded to discuss the motion with the parties further, and it ultimately reconsidered its ruling and denied the motion. Quintanilla contends that there were no circumstances under which the trial court could reverse its ruling once the trial

court orally granted his motion for directed verdict. Specifically, Quintanilla argues that jeopardy immediately attached because this oral ruling resolved, correctly or not, "some or all of the factual elements of the offense charged." *Martin Linen Supply Co.*, 430 U.S. at 571, 97 S. Ct. at 1354–55. Because the trial court reconsidered its oral ruling and denied the motion for directed verdict before any further trial proceedings took place, we conclude that no double-jeopardy violation occurred.

In *Smith v. Massachusetts*, 543 U.S. 462, 125 S. Ct. 1129 (2005), the United States Supreme Court examined whether a trial court may reconsider the grant of a mid-trial acquittal. Smith was facing three counts at trial: armed assault with intent to murder, assault and battery by means of a dangerous weapon, and unlawful possession of a firearm. *Id.* at 464, 125 S. Ct. at 1132. At the close of the State's case, Smith moved for a directed verdict on the firearm-possession count, and the trial court granted the motion. *Id.* at 465, 125 S. Ct. at 1132. The defense then proceeded with its case. *Id.*, 125 S. Ct. at 1133. After the defense rested, but before the jury was charged, the State presented the trial court with additional precedent that it contended supported submission of the firearm-possession count. *Id.* The trial court agreed, announcing that it was "reversing" its previous ruling and would submit the firearm-possession count to the jury. *Id.* The jury convicted Smith of all three counts. *Id.* at 466, 125 S. Ct. at 1133.

Smith appealed, contending that submission of the firearm-possession count to the jury violated the Double Jeopardy Clause. *Id.* The Appeals Court of Massachusetts affirmed, holding that the Double Jeopardy Clause was not implicated because the trial court's reversal of its ruling had not subjected Smith to a second prosecution or proceeding. *Id.* The Supreme Judicial Court of Massachusetts denied further appellate review, but the United States Supreme Court granted certiorari. *Id.*

The United States Supreme Court noted that, while reconsideration of a mid-trial acquittal may not prejudice a defendant when the reconsideration occurs before the defendant could have relied upon it in the presentation of his case, "when, as here, the trial has proceeded to the defendant's presentation of his case, the possibility of prejudice arises." *Id.* at 471–73, 125 S. Ct. at 1136–37 (acquittal must be treated as final "[i]f . . . the trial has proceeded to the defendant's introduction of evidence"). Even though the jury in *Smith* had not been made aware of the trial court's ruling, the defendant might have relied upon the ruling. *Id.* at 472, 125 S. Ct. at 1136–37. Once the possibility arose that the defendant had made strategic decisions about the presentation of his case based on the ruling, prejudice was possible and jeopardy attached.[2] *Id.*

---

[2] The Supreme Court noted that even if trial has moved forward, a trial court may still reconsider its ruling "[i]f . . . the availability of reconsideration has been plainly established by [a state's] pre-existing rule or case authority expressly applicable to

However, the Supreme Court went on to note that, while the Double Jeopardy Clause prohibits a trial court from reversing its ruling on a directed verdict if the case has proceeded to the defendant's presentation of evidence, "[d]ouble-jeopardy principles have never been thought to bar the immediate repair of a genuine error in the announcement of an acquittal, even one rendered by a jury." *Id.* at 474, 125 S. Ct. at 1138. "Moreover," the Court observed, "a prosecutor can seek to persuade the court to correct its legal error before it rules, or at least before the proceedings move forward." *Id.* Thus, double-jeopardy principles do not prohibit a trial court from reconsidering its oral ruling on a motion for directed verdict before the trial moves forward and the defendant presents his case. *See id.*

Other federal courts considering this issue both before and after *Smith* have come to similar conclusions. For example, in *United States v. Hill*, 643 F.3d 807 (11th Cir. 2011), the district court orally granted the defendant's motion for judgment of acquittal, and then the parties took a lunch break. *Id.* at 865. After the lunch break, the district court reversed its ruling on the motion. *Id.* The defendant contended that this reversal constituted a double-jeopardy violation. *Id.* at 866. The Eleventh Circuit noted that "[t]he Supreme Court . . . indicated in *Smith* that a judgment of acquittal is not final as soon as it is spoken or written." *Id.* at 867. The

---

midtrial rulings on the sufficiency of the evidence." *Smith v. Massachusetts*, 543 U.S. 462, 473, 125 S. Ct. 1129, 1137 (2005). Massachusetts had no such rule or precedent. *See id.*

14

Eleventh Circuit explained that *Smith* focused on the fact that there was a possibility that the defendant had relied upon the ruling in the presentation of his case. *Id.* The Eleventh Circuit observed:

> In this case, by contrast, the matter was "resolved satisfactorily before [the defendant] went forward with his case." . . . And that makes all the difference. Nothing was done, or could have been done, in reliance on the acquittal ruling between the time that ruling was announced and the time it was rescinded. All that happened in the interval (other than a lunch break) was that the court continued to hear and decide motions for judgment of acquittal from the other defendants. No one put on any evidence. No one opened or closed his case. No one did anything in front of the jury. The proceedings did not move forward until after the hearing on all of the motions to acquit had concluded, and by that time the judgment acquitting [the defendant] on the two counts had already been rescinded.

*Id.* at 867; *see also United States v. Baggett*, 251 F.3d 1087, 1095 (6th Cir. 2001) (trial court's reversal of ruling on acquittal made outside jury's presence after jury returned verdict did not constitute double-jeopardy violation); *cf. United States v. Baker*, 419 F.2d 83, 89 (2d Cir. 1969) (no double-jeopardy violation when "[t]he only prejudice [defendant] suffered is psychological; his hopes were first raised, then quickly lowered").

While no published Texas case has addressed this precise issue, two unpublished cases are consistent with *Smith* and the federal authorities. In the first case, *Yarborough v. State*, No. 02-14-00117-CR, 2015 WL 1743424 (Tex. App.—Fort Worth Apr. 16, 2015, pet. ref'd) (mem. op., not designated for publication), the Fort Worth Court of Appeals concluded that no double-jeopardy violation occurred

15

where the trial court initially orally granted a directed verdict, the parties continued discussion of motion, and the trial court reconsidered its ruling and denied the motion for directed verdict before the trial continued. *See id.* at *5–6. Similarly, in *Carter v. State*, No. 05-96-00805-CR, 1998 WL 83799 (Tex. App.—Dallas Feb. 24, 1998, no pet.) (mem. op., not designated for publication), the Dallas Court of Appeals concluded that no double-jeopardy violation occurred where the trial court initially orally granted a directed verdict, the parties continued arguing the motion, and the trial court then orally denied the motion. *Id.* at *1–2. The *Carter* court found it significant that the trial court granted and denied the motion in the same hearing, and never instructed the jury regarding returning a directed verdict, dismissed the jury, or entered a judgment of acquittal. *See id.*

Quintanilla relies on two Maryland cases to argue that a trial court may not reverse an oral ruling granting acquittal, even if the reversal is immediate. *See Allen v. Maryland,* 850 A.2d 365, 372–73 (Md. Ct. Spec. App. 2004); *Pugh v. Maryland*, 319 A.2d 542, 545 (Md. 1974). These cases were decided before *Smith*, are contrary to the weight of authority, and are not binding upon us. For all of these reasons, we decline to follow them.

Quintanilla also relies upon *Holcomb v. State*, 445 S.W.3d 767 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). Holcomb was charged with aggregate theft between $100,000 and $200,000 from a number of parties, and at the close of the

16

State's case, the trial court granted a directed verdict as to theft from one of those parties. *See id.* at 775. Although the trial court never expressly reconsidered its ruling, the trial court included that party in the jury charge, permitting the jury to make fact findings about whether Holcomb stole from that party. *See id.* at 775–76. Holcomb was convicted of aggregate theft in an amount between $100,000 and $200,000. *Id.* at 771–72.

On appeal, relying on *Smith*, this Court concluded that the inclusion of this party in the jury charge violated the Double Jeopardy Clause because the case had proceeded to the defendant's presentation of her evidence after the directed verdict was granted. *See id.* at 776–78. When the amount that was alleged to have been stolen from the party as to whom the directed verdict was granted was subtracted from the aggregate theft amount, the amount fell below $100,000. *See id.* at 784. Accordingly, this Court reformed the judgment of conviction to reflect theft of property with an aggregated value between $20,000 and $100,000 and remanded the case for a new sentencing hearing. *Id.* Thus, *Holcomb* is consistent with *Smith's* holding that a directed verdict may not be reversed if the defendant has commenced presenting evidence, because the defendant may have relied on the ruling in the presentation of her case.

In the remaining cases upon which Quintanilla relies—*Evans v. Michigan*, 133 S. Ct. 1069 (2013), *Fong Foo v. United States*, 369 U.S. 141, 82 S. Ct. 671

(1962), and *York v. State*, 342 S.W.3d 528 (Tex. Crim. App. 2011)—a written judgment of acquittal was entered after either a jury was instructed to return a verdict of acquittal or a jury was discharged. They are therefore inapposite.

Here, the trial court initially orally granted the motion for directed verdict, but then continued to discuss the motion with the parties immediately afterwards for another five pages of the record. The trial court then reversed course and denied the motion for directed verdict. Between the initial oral grant and the subsequent denial of the motion for directed verdict, the proceedings did not move forward to Quintanilla's presentation of his case. In addition, the trial court did not instruct the jury regarding entering a directed verdict, nor did it dismiss the jury and enter a judgment of acquittal. Here, the jury was never made aware of any ruling regarding the motion for directed verdict, the jury was not discharged, and no formal judgment of acquittal was entered. For all these reasons, we hold that Quintanilla's rights under the Double Jeopardy Clause were not violated by the trial court's reversal of its oral ruling on the motion for direct verdict. *See Smith*, 543 U.S. at 474, 125 S. Ct. at 1138; *Hill*, 643 F.3d at 867; *Baggett*, 251 F.3d at 1095; *see also Yarborough*, 2015 WL 1743424, at *5–6 (no double jeopardy violation where trial court initially made oral ruling granting directed verdict, parties continued discussion of motion, and trial court reconsidered its ruling and denied motion for directed verdict); *Carter*, 1998 WL 83799, at *1–2 (no double jeopardy violation where trial court

18

initially made oral ruling granting directed verdict, parties continued arguments regarding motion, and trial court then orally denied motion; trial court had not instructed jury regarding directed verdict or dismissed jury and entered a judgment of acquittal).

Quintanilla also suggests that the trial court granted his motion for directed verdict for a second time when he re-urged the motion while the jury was deliberating. When Quintanilla re-urged his motion, the parties and the Court discussed whether the use of the term "pliers" in the indictment was surplusage. During the discussion, the Court said:

> All right. Okay. There is a case from the First Court of Appeals from '01, *Garza v. State*, where the Court says that surplusage language is not legally essential to constitute the offense alleged. However, there is an exception, when the needlessly pled language is descriptive of that which is legally essential to the charge, that is, when it defines the offense more narrowly, places it in a specific setting or describes the method of its commission, the State must prove that language.

> So unless you have something other than that, I'm prepared to bring the jury out and charge them to bring back an instructed verdict.

The State then reminded that judge that he had concluded the previous day that there was some evidence from which the jury could conclude beyond a reasonable doubt that pliers were used in the crime, and the defense disagreed. The trial court then stated:

> I think this comes back to it doesn't matter from the perspective of the complainant. It's what the defendant is put on notice of. And I think it also comes down to just—the more I've looked into this, it's

19

just a sufficiency of the evidence type deal; and the more cases I've looked at that discuss this type of issue, they've all been reversed. I mean, I can't find one that's upheld this sort of fine line sort of standard.

A lot of these cases have to deal with the State trying to abandon what they argued to be surplusage and the Court saying, no, you can't do that. You're making it more broader, and then it becomes a sufficiency of the evidence type deal. So unless y'all can show me something else, some case law, otherwise, I'm going to have Linda prepare a Judgment of Acquittal. So, all right.

The trial court took a brief recess, then came back on the record and the following colloquy occurred:

The Court: While we were preparing the motion, the jury rang with a verdict. I'm inclined to take that verdict, and we'll go from there.

Defense counsel: Just so that—

The Court: Yes.

Defense counsel: Just for appellate reasons, so the Court is denying both of my motions?

The Court: Yes.

Defense counsel: All right. Thank you, sir.

While the trial court's statements suggest an inclination to grant the motion for directed verdict, the qualifying statements to the effect that the State could "show me something else" convey openness to additional argument. Thus, the trial court's statements do not clearly convey a final ruling on the motion. But even if we were to construe these statements as an oral grant and subsequent oral denial of the motion for directed verdict, the logic of *Smith* and the federal authorities that applied to the trial court's first oral grant and denial applies to this exchange. As with the earlier

20

oral ruling and reversal, here, "[n]othing was done, or could have been done, in reliance on the acquittal ruling between the time that ruling was announced and the time it was rescinded. . . . No one put on any evidence. No one opened or closed his case. No one did anything in front of the jury." *Hill*, 643 F.3d at 867. This second exchange with the trial court had no effect on Quintanilla's presentation of his case, because he had already rested his case. *See Smith*, 543 U.S. at 472, 125 S. Ct. 1136–37 (jeopardy attached because defendant may have made strategic decisions based upon trial court's ruling). The exchange took place outside of the jury's presence and the jury was not made aware of it. *See Baggett*, 251 F.3d at 1095 (trial court's reversal of ruling on acquittal made outside jury's presence after jury returned verdict did not constitute double-jeopardy violation). Consequently, we hold that Quintanilla's rights under the Double Jeopardy Clause were not violated even if the trial court orally granted and then denied his motion for directed verdict for a second time. *See Baker*, 419 F.2d at 89 (no double-jeopardy violation when "the only prejudice [defendant] suffered is psychological; his hopes were first raised, then quickly lowered").

For the foregoing reasons, we hold that Quintanilla's rights under the Double Jeopardy Clause were not violated by the trial court's entry of judgment on the jury's verdict. *See Smith*, 543 U.S. at 474, 125 S. Ct. at 1138; *Hill*, 643 F.3d at 867;

*Baggett*, 251 F.3d at 1095; *see also Yarborough*, 2015 WL 1743424, at \*5; *Carter*, 1998 WL 83799, at \*1–2.

We overrule Quintanilla's sole issue.

**Conclusion**

We affirm the trial court's judgment.

Rebeca Huddle
Justice

Panel consists of Justices Keyes, Brown, and Huddle.

Publish. TEX. R. APP. P. 47.2(b).